IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KATHRYN MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-CV-145 GMS |
| | ) | |
| GEOX USA, INC., and GEOX SPA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF
IN SUPPORT OF THEIR MOTION TO DISMISS**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby, Esquire (Bar I.D. 1016)
Teresa A. Cheek, Esquire (Bar I.D. 2657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Attorneys for Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

NATURE AND STAGE OF THE PROCEEDING ................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ............................................................................................................ 4

I.  DEFENDANTS' MOTION TO DISMISS SHOULD BE
    GRANTED BECAUSE PLAINTIFF HAS NOT ALLEGED
    FACTS STATING A CLAIM UPON WHICH RELIEF MAY BE
    GRANTED. ......................................................................................................... 4

II.  COUNT I OF MILLER'S COMPLAINT FAILS TO STATE A
     CLAIM OF NATIONAL ORIGIN DISCRIMINATION UNDER
     42 U.S.C. § 1983 BECAUSE DEFENDANTS ARE PRIVATE
     CORPORATIONS AND NOT STATE ACTORS. .......................................................... 5

III.  COUNT II OF MILLER'S COMPLAINT FAILS TO STATE A
      CLAIM UNDER 42 U.S.C. § 1981 BECAUSE HER
      DISCRIMINATION CLAIM IS BASED ON NATIONAL
      ORIGIN. ........................................................................................................... 6

IV.  COUNT III OF MILLER'S COMPLAINT FAILS TO STATE A
     CLAIM OF "UNCONSTITUTIONALLY DISPARATE
     TREATMENT" BASED ON NATIONAL ORIGIN BECAUSE
     MILLER HAS NOT ALLEGED STATE ACTION AND
     BECAUSE SECTION 1983 IS THE EXCLUSIVE REMEDY FOR
     CLAIMS OF UNCONSTITUTIONALLY DISPARATE
     TREATMENT. ..................................................................................................... 7

V.  BECAUSE MILLER HAS NO VIABLE FEDERAL CLAIMS,
    THE COURT SHOULD DECLINE TO EXERCISE
    JURISDICTION OVER COUNT IV OF THE COMPLAINT, A
    STATE LAW CLAIM ALLEGING VIOLATION OF THE
    IMPLIED COVENANT OF GOOD FAITH AND FAIR
    DEALING. ......................................................................................................... 8

VI.  THE COURT LACKS PERSONAL JURISDICTION OVER
     DEFENDANT GEOX SPA. ..................................................................................... 8

CONCLUSION ......................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*
   1999 U.S. Dist. LEXIS 12455 WL 615175 (D. Del. Aug. 3, 1999) ............................................. 9

*Borough of West Mifflin v. Lancaster*,
   45 F.3d 780 (3d Cir. 1995) ...................................................................................................... 8

*Chimarev v. TD Waterhouse Investor Servs.*,
   280 F. Supp. 2d 208 (S.D.N.Y. 2003) ....................................................................................... 6

*Conley v. Gibson*,
   355 U.S. 41, 78 S.Ct. 99 (1957) ............................................................................................... 4

*eSpeed, Inc. v. BrokerTec USA, L.L.C.*,
   No. 03-612-KAJ, 2004 U.S. Dist. LEXIS 19760 (D. Del. Sept. 13, 2004) ........................... 9, 10

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945) .................................................................... 8

*Intel Corp. v. Silicon Storage Tech., Inc.*,
   20 F. Supp. 2d 690 (D. Del. 1998) ............................................................................................ 8

*Jackson v. Temple University of Commonwealth System of Higher Ed.*,
   721 F.2d 931 (3d Cir. 1983) ...................................................................................................... 5

*Kneipp v. Tedder*,
   95 F.3d 1199 (3d Cir. 1996) ...................................................................................................... 5

*Lewis v. J.C. Penney Co.*,
   948 F. Supp. 367 (D. Del. 1996) ............................................................................................... 6

*Lugar v. Edmondson Oil Co.*,
   457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982) ......................................................... 5

*Mosley v. Bay Ship Management, Inc.*,
   2000 U.S. Dist. LEXIS 20251 (D.N.J. 2000) ........................................................................... 4

*Northeast Jet Ctr. v. Lehigh-Northampton Airport Auth.*,
   C.A. No. 90-CV-1262, 1997 U.S. Dist. LEXIS 6493 (E.D. Pa. May 5, 1997), citing 42
   U.S.C.A. § 1983 (1996) ............................................................................................................ 5

*Ohemeng v. Delaware State College*,
   676 F. Supp. 65 (D. Del. 1988) ................................................................................................ 7

*Pen. Ben. Guar. Corp. v. White Consol. Indus.*,
   998 F.2d 1192 (3rd Cir. 1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687 (1984) .................. 4

*Provident Nat'l Bank v. California Federal Sav. & Loan Assoc.*,
   819 F.2d 434 (3d Cir. 1987) ..................................................................................................... 8

*Rendell-Baker v. Kohn*,
   457 U.S. 830, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982) ...................................................... 5, 7

064107 1001

*Runyon* v. *McCrary*,
    427 U.S. 160, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976) .............................................................. 6

*St. Francis College v. Al-Khazraji*,
    481 U.S. 604 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987) .......................................................... 6

*Thomas v. Shipka*,
    818 F.2d 496 (6th Cir. 1987) ...................................................................................................... 7

*United States* v. *Price*,
    383 U.S. 787 (1966) ..................................................................................................................... 5

*Vasilescu v. Black & Veatch Pritchard, Inc.*,
    155 F. Supp. 2d 1285 (D. Kan. 2001) ....................................................................................... 6

*Vassallo v. Clover, Div. of Strawbridge & Clothier*,
    767 F. Supp. 651 (E.D. Pa. 1990) .............................................................................................. 7

*Washington v. Union Carbide Corp.*,
    870 F.2d 957 (4th Cir. 1989) ...................................................................................................... 4

## Other Authorities

10 Del. C. § 3104(c) ......................................................................................................................... 9

28 U.S.C. § 1367(c)(3) ..................................................................................................................... 8

42 U.S.C. § 1981 ..................................................................................................................... 1, 2, 6

42 U.S.C. § 1983 ..................................................................................................................... 1, 2, 5

5A C. Wright & A. Miller, Federal Practice & Procedure:
Civ. 2d §1357 at 311-19 (2d Ed. 1990) ........................................................................................ 4

Fed. R. Civ. P. 4(e) ......................................................................................................................... 8

WP3:1100416 I                                                                                    064107 1001

## NATURE AND STAGE OF THE PROCEEDING

On March 10, 2005, Plaintiff Kathryn Miller filed a Complaint in this Court against Defendants Geox SPA, an Italian corporation, and Geox USA, a Delaware corporation.

The Complaint has four counts. In Count I, "1983 Violation," brought under 42 U.S.C. § 1983 ("Section 1983"), Miller alleges that Defendants discriminated against her with regard to her "job duties and assignments" based on her national origin (American). In Count II, "1981 Violation," brought under 42 U.S.C. § 1981 ("Section 1981"), Miller alleges that Defendants "interfered with Plaintiff's contract rights and illegally deprived her of her constitutionally guaranteed rights, privileges and immunities." Count II does not further specify the nature of the alleged interference or deprivation. Count III, for "Unconstitutionally Disparate Treatment," claims that Defendants discriminated against Plaintiff by denying her "the usual authority and benefits which generally accompany the job of Controller" because of her national origin. Count IV, "Good Faith and Fair Dealing," is a state law claim that in May 2003, Defendants induced Plaintiff to give up a second part-time job to return to full-time work for them, by making a false promise that she would be Controller of Geox USA.

On March 31, 2005, Defendants filed a Waiver of Service of Summons. On May 10, 2005, Defendants filed a motion to dismiss the complaint and an opening brief in support of the motion to dismiss. This is Defendants' Opening Brief in Support of Their Motion to Dismiss.

1

## SUMMARY OF ARGUMENT

1.      Count I of Miller's Complaint fails to state a claim of national origin discrimination under 42 U.S.C. § 1983 because her former employer is not a state or local government and she has not alleged any state action.

2.      Count II of Miller's Complaint fails to state a claim because 42 U.S.C. § 1981 does not apply to alleged discrimination based on national origin.

3.      Count III of Miller's Complaint fails to state a claim of "unconstitutionally disparate treatment" based on national origin under the United States Constitution or Delaware State Constitution because Defendants are private corporations and not State actors.

4.      The Court should decline to exercise supplemental jurisdiction over Count IV of Miller's Complaint, a state law claim alleging violation of the implied covenant of good faith and fair dealing.

5.      The Court should dismiss the Complaint as to Defendant Geox SPA under Rule 12(b)(2) for lack of personal jurisdiction.

                                    

## STATEMENT OF FACTS

Although Defendants dispute Miller's description of the circumstances of her departure from Geox USA, for purposes of this motion[1], the truthfulness of Miller's allegations must be accepted. Accordingly, for purposes of ruling on this motion, the Court should consider the following facts.

Plaintiff, Kathryn A. Miller's, Complaint, alleges that she is a resident of the State of Delaware. Complaint ¶ 1. She is a white, English-speaking female and United States citizen. Complaint ¶ 6. She has 20 years of experience in accounting and bookkeeping. Complaint ¶ 6.

Geox USA, Inc. is a Delaware corporation in the business of selling shoes, with an office in Newark, Delaware. Complaint ¶ 2. Geox SPA is an Italian corporation and is the parent of Geox USA, Inc. Complaint ¶ 3.

Miller began working for Geox USA, Inc. in February 2002. Complaint ¶ 7. She alleges that in March 2003, she asked for either a raise or a reduction in hours with no reduction in her salary. Complaint ¶ 9. Miller's schedule was reduced to three days a week without a reduction in her salary. Complaint ¶ 10. Miller obtained another part-time job. Complaint ¶ 11.

Her Complaint further alleges that in May 2003, Miller was asked to return to a full-time schedule and told her she would be the Controller of Geox USA, Inc. Complaint ¶ 12. Miller gave notice to her other employer and began working for Geox USA, Inc. on a full-time basis. Complaint ¶ 13. When Miller returned to full-time status at Geox USA, Inc., her title was Controller. Complaint ¶¶ 13, 14.

Miller alleges that in July 2003, she tendered her resignation from her position as Controller of Geox USA. Complaint ¶ 15. Miller's supervisor, Livio Libralesso, who is of Italian

---

[1]     Pursuant to Fed. R. Civ. P. 12(b)(6) and for purposes of this motion only, the well-pleaded allegations of Plaintiff's complaint are assumed to be true.

descent, urged her not to resign from Geox USA. Complaint ¶ 15. Libralesso promised Miller

that he would address the "cultural differences" that Miller found frustrating and that she alleges

had induced her resignation. Complaint ¶ 15. In September 2003, Miller was told that her

resignation was accepted. Complaint ¶ 16. In October 2003, Miller was told that her last day of

employment would be October 23, 2003. Complaint ¶ 16. Miller was told that an Italian

employee would replace her as Controller. District Court Complaint ¶ 16.

## ARGUMENT

## I.    DEFENDANTS' MOTION TO DISMISS SHOULD BE GRANTED BECAUSE PLAINTIFF HAS NOT ALLEGED FACTS STATING A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

The standards applicable to a motion to dismiss are well established. A motion to dismiss

should be granted where a plaintiff has not pled and cannot plead any set of facts upon which

relief can be granted. *See, e.g.*, *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957);

*Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989). In considering the

allegations of the complaint, only the truth of well-pleaded facts need be assumed; conclusory

legal and factual contentions need not be given weight. *See, e.g.*, 5A C. Wright & A. Miller,

Federal Practice & Procedure: Civ. 2d §1357 at 311-19 (2d Ed. 1990). Further, it is improper to

assume that a plaintiff can prove facts not alleged. *Mosley v. Bay Ship Management, Inc.*, 2000

U.S. Dist. LEXIS 20251 at *9 (D.N.J. 2000). (Exhibit 8). In deciding a motion to dismiss, the

Court may consider the complaint, exhibits attached to the complaint, matters of public record

and undisputedly authentic documents if the plaintiff's claims are based upon those documents.

*Id.* at *10 (citing *Pen. Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3rd Cir.

1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687 (1984).

## II. COUNT I OF MILLER'S COMPLAINT FAILS TO STATE A CLAIM OF NATIONAL ORIGIN DISCRIMINATION UNDER 42 U.S.C. § 1983 BECAUSE DEFENDANTS ARE PRIVATE CORPORATIONS AND NOT STATE ACTORS.

Section 1983 is the statutory vehicle that authorizes the imposition of liability on anyone "who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States." *Northeast Jet Ctr v. Lehigh-Northampton Airport Auth*, C.A. No. 90-CV-1262, 1997 U.S. Dist. LEXIS 6493, *8 (E.D. Pa. May 5, 1997), citing 42 U.S.C.A. § 1983 (1996). Section 1983 "was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment." *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982). The elements of a claim under Section 1983 are: (1) conduct that deprived the plaintiff of a right secured by the Constitution of the United States, and (2) commission of such conduct by a person acting under color of state law. *Kneipp v Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). In *Rendell-Baker*, the Supreme Court rejected the argument of several private school teachers that they were entitled to federal due process rights in connection with their dismissals. The Court explained: "'In cases under § 1983, "under color" of law has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment.'" 457 U.S. at 838, quoting *United States* v. *Price*, 383 U.S. 787, 794, n. 7 (1966). Chief Justice Burger wrote, "the ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the state?'" *Id.*, quoting *Lugar v Edmondson Oil Co*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). None of the factors described in *Rendell-Baker* for determining whether the actions of a private person are attributable to the state are present in the case at bar.

In *Jackson v Temple University of Commonwealth System of Higher Ed.*, 721 F.2d 931, 932-33 (3d Cir. 1983), the Third Circuit held that a government employee could not bring an

5

action under § 1983 against the union that represented his bargaining unit because the union was not a state actor. In *Lewis v J.C. Penney Co* , 948 F. Supp. 367, 372-73 (D. Del. 1996), this Court held that a shopper stopped and questioned by store detectives could not bring a § 1983 action against them because they were not state actors.

Plaintiff does not allege state action and nothing in the Complaint indicates any connection between the state and the alleged discrimination against Plaintiff. Indeed, Plaintiff's Complaint affirmatively alleged that Defendant, Geox USA, Inc. is a Delaware corporation engaged in the business of selling shoes. Complaint, ¶ 12. Geox SPA is its parent corporation. Complaint ¶ 3. In the absence of state action, the Complaint does not state a claim under § 1983. Consequently, Count I of the Complaint must be dismissed.

III.    **COUNT II OF MILLER'S COMPLAINT FAILS TO STATE A CLAIM UNDER 42 U.S.C. § 1981 BECAUSE HER DISCRIMINATION CLAIM IS BASED ON NATIONAL ORIGIN.**

Section 1981 provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Section 1981 prohibits intentional race discrimination in both the private and public sectors. *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987); *Runyon* v. *McCrary*, 427 U.S. 160, 168, 174-175, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976). However, § 1981 does not prohibit discrimination based on national origin. *Chimarev v. TD Waterhouse Investor Servs.*, 280 F. Supp. 2d 208, 224 (S.D.N.Y. 2003) (§ 1981 does not prohibit discrimination based on national origin); *Vasilescu v Black & Veatch Pritchard, Inc.*, 155 F. Supp. 2d 1285, 1297 (D. Kan. 2001) (same); *Ohemeng v Delaware State College*, 676 F. Supp.

6

65, 68-69 (D. Del. 1988) (same). Plaintiff has not alleged that Defendants took any adverse action against her because of her race. In addition, Count II of Plaintiff's her Complaint alleges that Defendants "illegally deprived her of her constitutionality guaranteed rights. . ." These allegations fail as a matter of law because Defendants are not State actors. Consequently, Count II of the Complaint must be dismissed.

## IV.    COUNT III OF MILLER'S COMPLAINT FAILS TO STATE A CLAIM OF "UNCONSTITUTIONALLY DISPARATE TREATMENT" BASED ON NATIONAL ORIGIN BECAUSE MILLER HAS NOT ALLEGED STATE ACTION AND BECAUSE SECTION 1983 IS THE EXCLUSIVE REMEDY FOR CLAIMS OF UNCONSTITUTIONALLY DISPARATE TREATMENT.

Count III of the Complaint asserts a claim of disparate treatment in violation of the Fourteenth Amendment of the United States Constitution.[2] As the *Rendell-Baker* Court stated, "the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker*, 457 U.S. at 837. Since the Complaint does not allege state action, Count III must be dismissed.

In addition, Congress passed § 1983 to provide a remedy to alleged violations of the United States Constitution, and consequently, there is no additional implied cause of action under the Constitution. *Thomas v. Shipka*, 818 F.2d 496, 499-503 (6th Cir. 1987); *Vassallo v. Clover, Div of Strawbridge & Clothier*, 767 F. Supp. 651, 652, n. 3 (E.D. Pa. 1990).

---

[2] The Fourteenth Amendment provides, in pertinent part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . "

7

V.    **BECAUSE MILLER HAS NO VIABLE FEDERAL CLAIMS, THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER COUNT IV OF THE COMPLAINT, A STATE LAW CLAIM ALLEGING VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

When a federal court has exercised jurisdiction over both federal and state law claims, and has dismissed the federal claims, the court may then decline to exercise jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3). The general rule in the Third Circuit is that in the absence of viable federal law claims, the court should decline to exercise jurisdiction over state law claims, "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). Because the case has not progressed beyond the filing of the complaint and a motion to dismiss, there is no affirmative justification for this court to retain jurisdiction, and accordingly Count IV should also be dismissed.

VI.    **THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT GEOX SPA.**

Plaintiff has the burden of establishing facts that show with reasonable particularity that the Court can properly exercise jurisdiction over Defendant Geox SPA, an Italian corporation. *Provident Nat'l Bank v. California Federal Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987). A two-step analysis is required: first, the Court must examine the state's long-arm statute to determine whether the statute provides a basis for the Court's exercise of jurisdiction over the defendant, Fed. R. Civ. P. 4(e), and, second, the Court must determine whether the exercise of jurisdiction comports with fundamental notions of due process. *Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F. Supp. 2d 690, 694 (D. Del. 1998). S*ee generally, Int'l Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

The Delaware long-arm statute provides, in relevant part:

8

(c)    As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1)    Transacts any business or performs any character of work or service in the State;

(2)    Contracts to supply services or things in this State;

(3)    Causes tortious injury in the State by an act or omission in this State;

(4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5)    Has an interest in, uses or possesses real property in the State; or

(6)    Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c). If the facts indicate that the long-arm statute authorizes the Court's

exercise of jurisdiction over a defendant, the Court must still consider due process requirements.

There are two possible ways in which a court may constitutionally exercise jurisdiction over a

non-resident:

> The plaintiff may demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities with the forum state. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*, 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 (D. Del. Aug. 3, 1999). General jurisdiction does not require that the defendant's contacts be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. *Id.*

*eSpeed, Inc. v. BrokerTec USA, L.L.C.*, No. 03-612-KAJ, 2004 U.S. Dist. LEXIS 19760, *8 (D.

Del. Sept. 13, 2004).

The Complaint makes no reference to Delaware's long-arm statute and, consequently,

does not identify which, if any, of its provisions that Plaintiff contends are applicable to the case

at bar. The only contact between Geox SPA and Delaware that can be gleaned from the

9

Complaint is Geox SPA's ownership of a Delaware subsidiary, Geox USA. Plaintiff's alleged injury arose from her former employment relationship with defendant Geox USA; Plaintiff does not allege that Geox SPA ever employed her. Consequently, there is no provision in the Delaware long-arm statute on which plaintiff can rely to establish jurisdiction over Geox SPA.

The mere existence of a parent-subsidiary relationship is not sufficient. In *eSpeed, Inc*, this Court noted that only conduct by the subsidiary specifically known to have been instigated by the parent will be attributed to the parent for jurisdictional purposes. 2004 U.S. Dist. LEXIS at *13. Plaintiff provides no factual basis for drawing such a conclusion. She does not identify who asked her to return to full-time employment at GeoxUSA, or who made the decision to terminate her employment. The Complaint does not identify the decision maker as a director or employee of Geox SPA rather than an employee of Geox USA, nor does it provide any other basis for the Court to attribute the actions of Geox USA to Geox SPA. Accordingly, the Complaint against defendant Geox SPA should be dismissed for lack of personal jurisdiction.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Complaint be

dismissed in its entirety.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby (No. 1016)
Teresa A. Cheek, Esquire (No. 2657)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Attorneys for Defendants

Dated: May 10, 2005

11

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2005, I electronically filed a true and correct copy of the foregoing Defendants' Opening Brief In Support Of Their Motion To Dismiss with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record. A courtesy copy of such Defendants' Opening Brief In Support Of Their Motion To Dismiss was also hand delivered to the following counsel of record on this date.

Robert D. Goldberg, Esquire
Biggs & Battaglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (No. 1016)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Email: tchee@ycst.com
Attorneys for Defendants

Dated: May 10, 2005

064107 1001

# **EXHIBIT A**

AMERICAN BIO MEDICA CORPORATION, Plaintiff, v. PENINSULA DRUG ANALYSIS CO., INC.; JAMES T. RAMSEY; PHAMATECH, INC.; DIPRO DIAGNOSTIC PRODUCTS, INC.; DIPRO DIAGNOSTIC PRODUCTS OF NORTH AMERICA, INC., Defendants

Civil Action No. 99-218-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1999 U.S. Dist. LEXIS 12455

August 3, 1999, Decided

**NOTICE:**  **[\*1]**  FOR ELECTRONIC PUBLICATION ONLY

Defendants' motions to dismiss granted in part and denied in part. Defendants' motions to transfer venue granted. **COUNSEL:** For plaintiff: Daniel F. Wolcott, Jr., Esquire, Gregory A. Inskip, Esquire, Joanne Ceballos, Esquire, Potter, Anderson & Corroon LLP, Wilmington, Delaware.

For plaintiff: Charles Michael Tobin, Esquire, Hopkins & Sutter, Washington, D.C.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Matthew B. Lehr, Esquire, Maryellen Noreika, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Edward W. Moore, Esquire, Dallas, Texas.

For Peninsula Drug Analysis Co., Inc., James T. Ramsey, DiPro Diagnostic Products, Inc., DiPro Diagnostic Products of North America, Inc., defendants: Doreen L. Costa, Esquire, Neil P. Sirota, Esquire, Steven R. Gustavson, Esquire, Of Counsel, Baker & Botts, L. L. P., New York, New York.

For Phamatech, Inc., defendant: Kevin W. Goldstein,  **[\*2]**  Esquire, Ratner & Prestia, Wilmington, Delaware.

For Phamatech, Inc., defendant: Steele N. Gillaspey, Esquire, Of Counsel, Gillaspey, Harms & Associates, San Diego, California.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION: MEMORANDUM OPINION**

Dated: August 3, 1999

Wilmington, Delaware

**ROBINSON,** District Judge

**I. INTRODUCTION**

Pending before the court are motions to dismiss or transfer venue filed by defendants Dipro Diagnostic Products of North America, Inc. ("Dipro"), Phamatech, Inc. ("Phamatech"), and Peninsula Drug Analysis Co., Inc. and James T. Ramsey ("Peninsula" and "Ramsey," respectively) (D.I. 17, 25 and 49) Plaintiff American Bio Medica Corporation ("ABMC") opposes said motions. ABMC owns the rights to U.S. Design Patent No. D404812, which patent issued on January 26, 1999. ABMC is a New York corporation engaged in the manufacture, worldwide distribution and sale of the Rapid Drug Screen, a product covered by the patent at issue. According to ABMC, when the Rapid Drug Screen was developed in 1995, it was the first vertical, hands free test for the detection of the presence of drug residue in urine. Until February  **[\*3]**  1999, ABMC purchased test strips from defendant Phamatech for incorporation into the Rapid Drug Screen. ABMC alleges that Phamatech initiated production of its own vertical test kit (Quick Screen) in 1998 or earlier, using proprietary information it acquired by reason of its supply relationship with ABMC.

Defendant Phamatech is a California corporation. According to ABMC, Phamatech distributes Quick Screen through the auspices of defendants Peninsula and Ramsey, among others. Defendant Dipro is a Delaware corporation that, according to ABMC, acquires directly or indirectly from Phamatech an accused product called Rapid Response and distributes that product through Peninsula and Ramsey, among others. Peninsula is a Virginia corporation and Ramsey is the sole stockholder and an employee of Peninsula.

Plaintiff ABMC initiated this lawsuit on April 7, 1999 against defendants for design patent infringement, violation of the Lanham Act, and other acts of unfair competition. A day later, on April 8, 1999, Phamatech filed suit in the United States District Court for the Southern District of California seeking a declaratory judgment that ABMC's design patent is invalid, and joining other **[*4]** federal and state claims essentially mirroring the claims and operative facts at issue. By decision issued June 21, 1999, Judge Keep of the Southern District of California found that the California court could exercise specific personal jurisdiction over ABMC; however, applying the "first−filed" rule, she stayed the California case pending disposition of the instant motions.

## II. FACTS

The facts are essentially undisputed. Prior to the filing of the complaint, none of the accused products had been sold to a Delaware resident. In the fall of 1998, defendant Peninsula did ship an order of ABMC's Rapid Drug Screen to a Delaware resident, Pace Electric of New Castle, Delaware. Sometime thereafter and prior to January 1999, Peninsula stopped handling ABMC's product. In January 1999, defendant Ramsey and a third party met with a representative of Pace to discuss a possible business relationship for the sale and distribution of the Phamatech/Dipro product, Rapid Response, in Delaware. These discussions took place in Hawaii and Maryland. Although there are averments of record indicating that some agreement was reached (D.I. 32), it is the court's understanding that no actual sales **[*5]** or movement of defendants' products occurred in Delaware prior to the filing of the complaint.

Prior to April 1999, Peninsula sent direct mail postcards to Delaware as part of a mass mailing to potential customers in more than 20 states. n1 Both Ramsey and Phamatech maintain national Internet websites that can be accessed from Delaware. It is the court's understanding that these websites include promotional material about the allegedly infringing products, including information on ordering and shipping; however, orders cannot be consummated directly through the websites.

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – – –

n1 Approximately 60 out of a total of 6,000 postcards were directed to Delaware residents. No responses are recorded.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

## III. DISCUSSION

### A. Personal Jurisdiction

ABMC, as plaintiff, bears the burden of establishing that this court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested without the benefit of discovery, the plaintiff need only establish a prima facie case with the record **[*6]** viewed in the light most favorable to the plaintiff. See Applied Biosystems, Inc. v. Cruachem, Ltd., 772 F. Supp. 1458, 1462 (D. Del. 1991); Computer People, Inc. v. Best Int'l Group, Inc., 1999 Del. Ch. LEXIS 96, No. Civ. A. 16648, 1999 WL 288119, at *4 & n.5 (Del. Ch. Apr 27, 1999). There is no question but that this court can exercise personal jurisdiction over defendant Dipro, a Delaware corporation. The focus of the following discussion, therefore, is whether the exercise of personal jurisdiction over the remaining defendants comports with the law of the Federal Circuit. n2

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – – –

n2 According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out−of−state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss [*7] a suit for "lack of jurisdiction over the person." According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987). The principle pronounced above is traditionally described in this court as a two-step analysis. The court will determine, first, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendants' rights to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed "broadly . . . to confer jurisdiction to the maximum extent possible [*8] under the due process clause." LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986). As noted by this court in Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998), "the Delaware Supreme Court has not determined that § 3104(c) is coextensive with federal due process, nor does it substitute federal due process analysis for state long-arm analysis." Accord Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 480-81 (Del. 1992); Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods. Inc., 1991 Del. Ch. LEXIS 113, Civ. A. No. 12036, 1991 WL 129174, at *3 (Del. Ch. July 10, 1991); Ramada Inns v. Drinkhall, 1984 Del. Super. LEXIS 599, No. Civ. A. 83 C-AU-56, 1984 WL 247023, at *2 (Del. Super. May 17, 1984) Therefore, the court must determine that the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendants' constitutional rights to due process. n3

– – – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n3 The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we . . . defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998). Thus, in Luker, the Federal Circuit's analysis followed that of the Sixth Circuit's holding in R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc., 811 F.2d 967 (6th Cir. 1987): "'This Ohio [long-arm] statute has been construed to extend to the outer limits of due process, and thus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations.'" Luker, 45 F.3d at 1544 (quoting Dribeck, 811 F.2d at 969). By contrast, as noted above, the Delaware state courts do not collapse the long-arm inquiry into the due process inquiry and neither shall this court.

– – – – – – – – – – – – End Footnotes – – – – – – – – – – – – –

[*9]

Delaware's long-arm statute provides:

> (c) As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services,

or things used or consumed in the State

. . . .

Del. Code Ann. tit. 10, § 3104(c)(1) − (4).

As explained by the Delaware Supreme Court in LaNuova,

> the conduct embraced in subsections (1) and (2), the transaction of business or performance of work and contracting to supply services or things in the State, may supply the jurisdictional basis for suit only with respect to claims which have a nexus to [*10] the designated conduct. Where personal jurisdiction is asserted on a transactional basis, even a single transaction is sufficient if the claim has its origin in the asserted transaction.

> . . .

> Similarly, where the claim is one for tortious injury under subsection (c)(3),

> a single "act or omission" in the State in which the injury was caused will suffice. Such a claim may also be viewed as transactional.

LaNuova, 513 A.2d at 768. Therefore, in order to establish transactional or specific jurisdiction, plaintiff must demonstrate not only that an act or acts occurred in Delaware but also that its causes of action arise from those act or acts. According to relevant caselaw, plaintiff also must demonstrate that the act or acts occurring in Delaware actually constitute "transacting business" in Delaware, i.e., that defendants "purposefully avail[ed themselves] of the privileges and benefits of Delaware law." Computer People, Inc., 1999 WL 288119, at *8; see also Thorn EMI N. Am. v. Micron Tech., Inc., 821 F. Supp. 272, 274 (D. Del. 1993) (stating that the designated conduct "must be directed at residents of the State of [*11] Delaware and the protection of its laws"). With this requirement in mind, courts have concluded that "mere solicitation does not arise to transacting business, nor does the isolated shipment of goods into Delaware." Id. (citing Moore v. Little Giant Indus., Inc., 513 F. Supp. 1043, 1047 (D. Del. 1981); Waters v. Deutz Corp., 460 A.2d 1332, 1335 (Del. Super. 1983). The distinction between isolated business activities and those giving rise to personal jurisdiction has been explained on the basis of whether the conduct is "part of a general business plan . . . to solicit business in Delaware and deliver products to customers in Delaware." Thorn EMI, 821 F. Supp. at 274.

Plaintiff alleges in its complaint seven causes of action, including unlawful use of the trademarks and service marks of the Rapid Drug Screen in violation of the Lanham Act and common and state law trademark rights; violation of the design patent "by making, using and/or selling the ABMC design . . ."; and engaging in unfair competition and deceptive trade practices. (D.I. 1) Although the products at issue have not been made, used, or sold in Delaware, plaintiff [*12] asserts that, "through offers and extensive planning to sell the infringing product in Delaware, defendants have engaged in a course of conduct that readily meets the nexus requirements of sections 3104(c)(1), (2), and (3)." (D.I. 57 at 7−8)

The record demonstrates that defendants Peninsula and Ramsey have offered to sell n4 allegedly infringing products to Delaware residents through what appears to be a concerted marketing effort. The marketing effort includes national advertisements accessible to Delaware residents (the internet website), out−of−state sales negotiations with a Delaware resident, n5 and the mailing of promotional materials to Delaware residents. Given the history of these defendants' relationship with plaintiff, the record adequately demonstrates that these activities are directed at Delaware residents, constitute "transacting business," and are sufficiently related to plaintiff's causes of action to satisfy the requirements of 10 Del. C. § 3104(c)(1). n6 Cf. Computer People, Inc., 1999 WL 288119, at *8. n7

− − − − − − − − − − − − − − − Footnotes − − − − − − − − − − − − − − −

n4 Plaintiff did not specifically allege such in its complaint; however, 35 U.S.C. § 271(a) reads "whoever without authority makes, uses, **offers to sell**, or sells any patented invention . . . infringes the patent." (Emphasis added)

[*13]

n5 The out−of−state sales negotiations with Pace Electric are viewed in tandem with defendants' other conduct as evidence of a general business plan directed at Delaware residents and the protection of its laws.

n6 As noted, the court is satisfied that the activities described above are "part of a general business plan" and not

isolated, unrelated events. In the past, this court has demanded as well proof that the activities have had a "tangible effect" in Delaware. See, e.g., Intel Corp., 20 F. Supp. 2d at 696 (" . . SST's solicitations in Delaware [have not] been shown to have had any tangible effect on Intel's sales here.") Sales are lost generally because of the sale of competing products. Given the fact that liability under 35 U.S.C. § 271(a) can now rest on mere "offers to sell," the court is reluctant to require proof of actual sales and is not sure what other "tangible effect" is contemplated. Therefore, the court will not require evidence of "tangible effects" in this case.

n7 Although the court noted that, "as a general matter telephone calls and an e-mail [to a Delaware resident] do not, in and of themselves, automatically constitute 'transacting business' within Delaware sufficient to invoke jurisdiction under § 3104(c)(1)," the court looked at the specific factual context and held that these contacts were insufficient because they could not be a basis for the plaintiff's causes of action.


– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

[*14]

The court further finds that the exercise of personal jurisdiction over these defendants comports with federal due process considerations. The Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), held that


due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."


Id. at 316 (citation omitted). The Court in Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985), added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." Id. at 475 n.18. Therefore, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case [*15] that the presence of some other considerations would render jurisdiction unreasonable." Id. at 477. In Luker, the Federal Circuit suggested a three-prong jurisdictional analysis: 1) has the defendant purposefully directed its activities at residents of the forum?; 2) do the claims arise out of or relate to those activities?; 3) is the assertion of personal jurisdiction reasonable and fair? See Luker, 45 F.3d at 1545-46. The court has already answered the first two inquiries in the affirmative and has not discovered in the record any compelling evidence which suggests that the exercise of personal jurisdiction over these defendants would be unreasonable.

The court concludes otherwise with respect to defendant Phamatech. The conduct attributed to Phamatech includes the following: 1) Phamatech manufactures allegedly infringing products; 2) Phamatech arranges for the distribution of its product through defendants Peninsula and Ramsey; and 3) Phamatech advertises its product through an Internet website accessible to Delaware residents. As noted previously, however, there had been no actual sales of infringing product in Delaware prior to the filing [*16] of the complaint. Neither is there evidence relating Phamatech to Peninsula and Ramsey's marketing efforts directed at Delaware residents. Although plaintiff asserts that "Phamatech intentionally established a chain of distribution that it knew, or reasonably could have foreseen, had a termination point in Delaware" (D.I. 62 at 11), the record does not demonstrate the existence of ongoing commercial relationships with retailers and customers in Delaware.

The facts of record are distinguishable, therefore, from the facts in Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994), cited by plaintiff. In that case, the court concluded that the alleged infringers were placing accused products into the chain of commerce, which included shipping products into the forum for sale to customers through an intermediary. Because the commercial relationship with the intermediary was ongoing and the accused products in fact had been shipped into the forum, the court found the defendant amenable to the exercise of personal jurisdiction: "From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and [the [*17] intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum]." Royal Sovereign, 21 F.3d at 1564. Instantly, there is no evidence demonstrating that Phamatech directed Peninsula and Ramsey's sales efforts at Delaware residents; there certainly is no evidence of any ongoing commercial relationships between Phamatech, Peninsula/Ramsey, and Delaware residents. The final conduct designated is Phamatech's Internet website. Assuming for purposes of this motion that a website with product information constitutes an "offer to sell," in the absence of evidence that Delaware residents actually accessed this website, the court declines to find that Phamatech transacted business in Delaware, consistent with 10 Del. C. § 3104(c)(1) and (3). n8

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n8 Plaintiff does not assert general jurisdiction under § 3104(c)(4)

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

**B. Venue**

Generally, in reviewing a motion for transfer of venue, this court gives great **[*18]**  deference to a plaintiff's choice of forum and only transfers venue if the defendants truly are regional (as opposed to national) in character. Motions to transfer venue are granted as well if there is a related case which has been filed first or otherwise is the more appropriate vehicle to litigate the issues between the parties. Given the court's conclusion that it cannot exercise personal jurisdiction over defendant Phamatech, the manufacturer of the accused products, transfer of this case to the Southern District of California is warranted.

**IV. CONCLUSION**

For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Defendants' motions to transfer venue are granted.

An appropriate order shall issue.

eSPEED, INC.; CANTOR FITZGERALD, L.P.; CFPH, L.L.C., and eSPEED GOVERNMENT SECURITIES, INC., Plaintiffs, v. BROKERTEC USA, L.L.C.; BROKERTEC GLOBAL, L.L.C.; GARBAN, LLC; ICAP PLC; OM AB; and OM TECHNOLOGY (U.S.), INC., Defendants.

Civil Action No. 03−612−KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 19760

September 13, 2004, Decided

**PRIOR HISTORY:**  eSpeed, Inc. v. BrokerTec USA, L.L.C., 2004 U.S. Dist. LEXIS 20589 (D. Del., Sept. 9, 2004)

 [*1]  Motion of defendant ICAP Plc to dismiss for lack of personal jurisdiction granted. Plaintiffs' contingent cross motion to compel discovery denied. **COUNSEL:** Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, counsel for plaintiffs.

Of counsel: Gary A. Rosen, Esquire, Law Offices of Gary A. Rosen, P.C., Philadelphia, Pennsylvania; David J. Wolfsohn, Esquire, Alan C. Promer, Esquire, and Michele D. Hangley, Esquire, Hangley Aronchick Segal & Pudlin, Philadelphia, Pennsylvania.

Richard L. Horwitz, Esquire and David E. Moore, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, counsel for defendants.

Of counsel: James W. Dabney, Esquire, Peter L. Simmons, Esquire, and Henry C. Lebowitz, Esquire, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:  MEMORANDUM OPINION**

Wilmington, Delaware

**JORDAN, District Judge**

I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under 28 U.S.C. § 1338. The plaintiffs filed their Complaint on June 30, 2004, naming [*2]  BrokerTec USA L.L.C. ("BrokerTec"), BrokerTec Global, L.L.C., Garban, L.L.C. ("Garban"), OM Technology (U.S.), Inc., OM AB, and ICAP Plc ("ICAP") as defendants. (Docket Item ["D.I."] 1.) Presently before me is ICAP's Motion to Dismiss for Lack of Personal Jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2)  (D.I. 161; the "Motion".) For the reasons that follow, ICAP's Motion will be granted.

II. BACKGROUND

A. The Parties

The plaintiffs are all corporate entities recognized under the laws of the State of Delaware and have their principal places of business in New York, New York. (D.I. 1, PP 2−4; see also D.I. 512.) Defendants BrokerTec, BrokerTec Global, L.L.C., Garban are all limited liability companies organized under Delaware law and have their principal places of business in Jersey City, New Jersey. (Id., PP 5−7.) ICAP is a corporation organized and existing under the laws of the United Kingdom and has a principal place of business in the United States in Jersey City, New Jersey. (Id., P 8.)

B. Factual Background

Shortly after ICAP filed its Motion, the parties stipulated to and engaged in [*3]  jurisdictional discovery. (See D.I. 185.) Because the plaintiffs have the burden of proving that it is proper for me to exercise personal jurisdiction over ICAP in this District, see Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d 434, 437 (3d Cir. 1987), the following is taken largely from the plaintiffs' recitation of

the facts (*see* D.I. 271 at 3–10), unless noted otherwise.

The plaintiffs allege that all of the defendants are willfully and intentionally infringing U.S. Patent No. 6,560,580 B1 (issued May 6, 2003), which is entitled "Automated Auction Protocol Processor". (*See* D.I. 1, Ex. A.) ICAP, one of the six named defendants, is a public limited company incorporated in England and listed on the London Stock Exchange. (D.I. 162 at 2; D.I. 271 at 3.) n1 ICAP claims that it is not registered to conduct business in Delaware and that it has no registered agent for service of process in Delaware or any other state within the United States. (*Id.*) ICAP also asserts that it does not transact business, perform any work or services, or engage in any persistent course of conduct in Delaware. (*Id.*) ICAP characterizes itself as a "holding [*4] company" that is the "ultimate parent of a group of companies whose principal business is that of a worldwide voice and electronic interdealer broker of a variety of financial instruments in the wholesale markets." (D.I. 162 at 2.)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n1 In support of its factual assertions pertaining to jurisdiction, ICAP cites the Declaration of Helen Broomfield, the Company Secretary of ICAP (attached to D.I. 162 as Ex. 1).

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

In its 2003 Annual Report, ICAP described itself as the "world's largest voice and electronic interdealer broker" with "more than 2,800 staff, operating from 21 offices worldwide." (D.I. 271 at 3–4.) Further, ICAP defines itself as the parent company of an array of entities that are members of the "ICAP Group" (hereinafter the "ICAP Group" or the "Group"). (*Id.* at 4.) ICAP owns 100% of the twelve American subsidiaries that are a part of the Group. n2 (*Id.* at 4.) The Group is managed, as a whole, by the ICAP Board of Directors (the "Board"). (*Id.*) The Board approves the ICAP Group's budget and makes [*5] regular internal audit visits to the Group's operating companies in the United States. (*Id.* at 5, 9.) ICAP earns about 35 percent of its profits from its operations in the United States. (*Id.* at 9.)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n2 BrokerTec and Garban are two of ICAP's subsidiaries. (D.I. 271 at 6.) Furthermore, the following members of the ICAP Group have filed certificates of amendment or correction in Delaware between 1999 and 2003: First Brokers Securities LLC, Garban Capital Markets LLC, Garban Corporates LLC, Garban Futures LLC, Garban Information Systems (Americas) LLC, Garban Securities LLC, Garban LLC, ICAP Services North America LLC, Wembley Asset Management LLC, and Wrightson ICAP LLC. (*Id.* at 8 (citing D.I. 275, Ex. 30).)

– – – – – – – – – – – End Footnotes– – – – – – – – – – – –

ICAP, together with its BrokerTec n3 and Garban subsidiaries, maintains two websites, namely, www.icap.com and www.brokertec.com. (*Id.* at 6.) These websites allow users to access and use the ICAP Group's accused electronic trading platforms n4 from anywhere in the world. (*Id.*)

– – – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n3 ICAP acquired BrokerTec, a Delaware company, on May 7, 2003. (*Id.* at 7.)

[*6]

n4 BrokerTec's Electronic Trading Network ("ETN") and Garban's Electronic Trading Community ("ETC"). (D.I. 271 at 6.)

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ End Footnotes‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

III. STANDARD OF REVIEW

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a court may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

_Omni Capital Int'l v. Rudolf Wolff & Co.,_ 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987). This principle is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

Rule 4(e)(1) of the Federal Rules of Civil Procedure [*7] states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." The Delaware long-arm statute, 10 Del. C. § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause. n5 _La Nuova D&B S.p.A. v. Bowe Co. Inc.,_ 513 A.2d 764, 768 (Del. 1986). I must nevertheless determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. _Intel Corp. v. Silicon Storage Tech., Inc.,_ 20 F. Supp. 2d 690, 694 (D. Del. 1998); _see generally, Int'l Shoe Co. v. Washington,_ 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ Footnotes ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

n5 According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. _Akro Corp. v. Luker,_ 45 F.3d 1541, 1543 (Fed. Cir. 1995). The Federal Circuit has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." _Graphic Controls Corp. v. Utah Med. Prods., Inc.,_ 149 F.3d 1382, 1386 (Fed. Cir. 1998). The Delaware Supreme Court has not collapsed the analysis under the Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ End Footnotes‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

[*8]

As noted previously, once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred between the forum state and defendant to support jurisdiction. n6 _Provident Nat'l Bank,_ 819 F.2d at 437; _see also Ace & Co., Inc. v. Balfour Beatty PLC,_ 148 F. Supp. 2d 418, 422 (D. Del. 2001) (plaintiff must present facts that "establish with reasonable particularity" that the defendant is subject to personal jurisdiction). The plaintiff may demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities with the forum state. _American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,_ 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 (D. Del. Aug. 3, 1999). General jurisdiction does not require that the defendant's contacts be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. _Id._

– – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

N6 In this case, the parties agreed to conduct jurisdictional discovery shortly after ICAP filed its Motion (see supra at p. 2) The plaintiffs have filed a Contingent Cross Motion to Compel Discovery on the Issue of Personal Jurisdiction (D.I. 272) asking me to order ICAP to more fully respond to certain of the plaintiffs' jurisdictional discovery requests The parties had an ample opportunity to conduct jurisdictional discovery, and the plaintiffs have not persuaded me that ICAP improperly obstructed the course of that discovery. Furthermore, as discussed more fully infra at n 7, the discovery that the plaintiffs seek to compel is immaterial to the disposition of ICAP's Motion. Therefore, I will decide ICAP's Motion on the basis of the record currently before me, and the plaintiffs' Motion to Compel (D.I. 272) will be denied.

– – – – – – – – – – – End Footnotes– – – – – – – – – – – – –

[*9]

The Delaware long–arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c) The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents [*10]   a means of redress against those not subject to personal service within the State." Boone v. Oy Partek Ab, 724 A.2d 1150, 1156–57 (Del. Super. 1997)

IV. DISCUSSION

ICAP asserts that it is not subject to jurisdiction in Delaware under any section of the Delaware long–arm statute. (D.I. 162 at 4–5.) The plaintiffs say that ICAP is subject to specific jurisdiction, under 10 Del. C. § 3104(c)(1), on the basis of its website activities and its subsidiaries' actions in Delaware. (D.I. 271 at 11–16, 20.) The plaintiffs also argue that ICAP is subject to general jurisdiction under 10 Del. C. § 3104(c)(4) because it has "made continuous and systematic filings in Delaware relating to the formation, operation and cancellation" of its subsidiaries in Delaware (see supra at n 2) (Id. at 19.)

First, I am unpersuaded that it is appropriate to exercise specific jurisdiction over ICAP in Delaware on the basis of its website activity alone. "Where the defendant is clearly doing business through its website in the forum state, and where the claim relates to or arises out of use of the website," it is proper to exercise [*11]  specific jurisdiction over a defendant   See Toys 'R' Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452–54 (3d Cir. 2003) (specific jurisdiction exists if "the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its website to the state, knowingly interacting with residents of the forum state via its website, or through sufficient other related contacts.") In this case, the plaintiffs have come forward with evidence showing that ICAP's websites are accessible to computer users anywhere in the world. Mere accessibility of a website, though, is not a matter of much moment. It is interactivity and the conducting of business over the Internet that carries jurisdictional consequences Toys 'R' Us, 318 F.3d at 452 (exercise of personal jurisdiction proper where commercial website's interactivity reflected specifically intended interaction with residents of the forum state) (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)) There is no evidence that ICAP has any customers in Delaware, let alone customers who accessed ICAP's websites, downloaded the [*12]  BrokerTec ETN or the Garban ETC, and then conducted trades from Delaware  n7 (See D.I. 271 at 20, 23.) Not only have the plaintiffs failed to show that ICAP specifically intended to interact with Delaware residents through its website, they have failed to show that there were any ICAP customers in Delaware who were actually capable of conducting electronic trading via ICAP's websites. Therefore, the plaintiffs have failed to prove that ICAP purposefully availed itself of conducting activity in Delaware by directly targeting its websites to Delaware or knowingly interacting with residents of Delaware through its

websites, *see Toys 'R' Us*, 318 F.3d at 453, and I decline to exercise personal jurisdiction over ICAP on the basis of its website alone.

— — — — — — — — — — — — Footnotes — — — — — — — — — — — — — —

n7 For that matter, there is no evidence that people in Delaware accessed ICAP's websites at all, *i.e.*, while surfing the Internet. I am aware of the plaintiffs' request to compel further discovery from ICAP pertaining to the "ICAP Website Report" compiled by a company called Webtrends (*see* D.I. 273 at 7); however, that information is immaterial, since the plaintiffs haven't even shown, in the first instance, that ICAP has customers in Delaware who are able to actually conduct business through any ICAP websites. For this reason, and for the reasons stated *supra* at n.6, the plaintiffs' request to compel further discovery pertaining to Webtrends will be denied.

— — — — — — — — — — End Footnotes— — — — — — — — — — — — —

**[*13]**

I am also unpersuaded by the plaintiffs' second argument that the actions of ICAP's subsidiaries may be attributed to ICAP for the purpose of establishing specific jurisdiction (*Id.* at 16.) As ICAP points out, "under the agency theory only precise conduct known to be instigated by the parent is attributed to the parent" for jurisdictional purposes. (D.I. 296 at 4–5 (citing *C.R. Bard v. Guidant Corp.*, 997 F. Supp. 556, 558–59 (D. Del. 1998)).) The record shows that ICAP owns twelve American subsidiaries that are a part of the ICAP Group, and that ICAP's Board manages the ICAP Group as a whole. However, there is no evidence that ICAP's Board exerted some particular control over BrokerTec, Garban, or other American subsidiaries, such that the conduct of those subsidiaries in Delaware would be attributed to ICAP. n8 Thus, the plaintiffs have failed to meet their burden of proving with reasonable particularity that exercising specific jurisdiction over ICAP is appropriate in this case.

— — — — — — — — — — — — Footnotes — — — — — — — — — — — — — —

n8 To the extent that the plaintiffs are attempting to assert jurisdiction over ICAP under an alter ego theory, that theory is applicable only when "the party asserting jurisdiction [has established] some fraud, injustice, or inequity in the use of the corporate form." *Ace & Co., Inc. v. Balfour Beatty PLC*, 148 F. Supp. 2d 418, 425 (D. Del. 2001) (quoting *C.R. Bard*, 997 F. Supp. at 559). The plaintiffs have not come forward with any evidence to establish those things in this case.

— — — — — — — — — — End Footnotes— — — — — — — — — — — — —

**[*14]**

In order for me to exercise general jurisdiction over ICAP, the plaintiffs must prove that ICAP has continuous or systematic contacts with Delaware. *American Bio Medica Corp.*, 1999 U.S. Dist. LEXIS 12455, 1999 WL 615175 at *2. The plaintiffs say that ICAP "regularly transacts business within Delaware through the repeated formation, purchase, and operation of business entities" in Delaware. (D.I. 271 at 7.) The plaintiffs also argue that the ICAP Group has "merged and amended the articles and certificates for Delaware companies on numerous occasions." (*Id.* at 7–8.)

I am unpersuaded by the plaintiffs' argument that, because ICAP bought BrokerTec and the ICAP Group filed amended certificates for certain subsidiaries in Delaware, ICAP has continuous or systematic contacts with Delaware. First, when ICAP bought BrokerTec, BrokerTec was already an established Delaware corporation. ICAP did not take any steps to form or incorporate BrokerTec in Delaware. Second, there is no evidence on the record before me that ICAP, through its Board or otherwise, has done anything to disregard the separate corporate status and management that its subsidiaries have. There is evidence on the record that members **[*15]** of the Board occasionally travel to the United States on business; however, there is no evidence that they travel to Delaware. Furthermore, the fact that certain subsidiaries filed certificates of amendment in Delaware does not mean that ICAP filed those certificates, or even knew that they were being filed. The plaintiffs have not set forth any reason why the activities, in Delaware, of ICAP's subsidiaries should be imputed to ICAP itself. Because I find that the plaintiffs have not demonstrated with reasonably particularity that ICAP has continuous or systematic contacts with Delaware, I will not exercise general jurisdiction over ICAP.

Finally, the plaintiffs ask that I exercise jurisdiction over ICAP pursuant to Federal Rule of Civil Procedure 4(k)(2), on the basis that ICAP has sufficient minimum contacts with the United States as a whole. (D.I. 271 at 29.) Personal jurisdiction pursuant to Rule 4(k)(2) may be exercised if (1) ultimately, the plaintiff's claim arises under federal law, (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and (3) the federal court's exercise of personal jurisdiction [*16] over the defendant does not offend the Constitution or other federal law. *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 258 (3d Cir. 2000)*

In this case, the plaintiffs' patent infringement claims arise under federal law. However, ICAP asserts that it would properly be subject to jurisdiction in New Jersey, because that is where BrokerTec and Garban are headquartered. (D.I. 296 at 20.) Because ICAP is admittedly within the jurisdictional reach of New Jersey, I decline to exercise jurisdiction over ICAP under Rule 4(k)(2). *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001)* ("A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.")

## V. CONCLUSION

For these reasons, ICAP's Motion (D.I. 161) will be granted and the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) will be denied. An appropriate order will follow.

## ORDER

For the reasons set forth in the Memorandum Opinion issued today, it is hereby ORDERED that defendant ICAP Plc's Motion to Dismiss for Lack of Personal Jurisdiction (D.I. 161) is GRANTED and [*17] the plaintiffs' Contingent Cross Motion to Compel Discovery (D.I. 272) is DENIED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

September 13, 2004
Wilmington, Delaware

CHRISTOPHER MOSLEY, PLAINTIFF, v. BAY SHIP MANAGEMENT, INC., ROBERT C. WATTAM and THE UNITED STATES OF AMERICA, DEFENDANTS

CIVIL ACTION NO: 00-2306 (JCL)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

174 F. Supp. 2d 192; 2000 U.S. Dist. LEXIS 20251; 85 Fair Empl. Prac. Cas. (BNA) 101

December 27, 2000, Decided

December 27, 2000, Filed

[**1] Defendants' motion for summary judgment against the plaintiff on Counts One through Six, which subject to the plaintiff's release, granted; and Defendants' motion to dismiss the Seventh Count of plaintiff's complaint, alleging violations of Maryland law, granted; and Defendants' motion to dismiss the Eighth Count of plaintiff's complaint, alleging breach of contract of which he a third-party beneficiary, denied **COUNSEL:** For CHRISTOPHER MOSLEY, plaintiff: HENRY ALAN GLUCKSTERN, MAPLEWOOD, NJ.

For BAY SHIP MANAGEMENT, INC., ROBERT C. WATTAM, defendants: KEVIN P. KOPP, KAUFMAN, BORGEEST & RYAN, NEW YORK, NY.

**JUDGES:** John C. Lifland, United States District Judge.

**OPINIONBY:** John C. Lifland

**OPINION:** [*193] MEMORANDUM AND ORDER

**LIFLAND, District Judge**

INTRODUCTION

Defendants Bay Ship Management, Inc. ("BSM") and Robert C. Wattam ("Wattam") move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6). In their moving papers, the defendants base an argument for dismissal on a release signed by plaintiff [*194] on November 30, 1999. Pursuant to the Court's Order dated October 25, 2000, the defendants' motion for dismissal based on the release will be treated as a motion for [**2] summary judgment. On November 20, 2000, pursuant to the parties' stipulation, the Court ordered dismissal of this action only as to the defendant United States.

For the following reasons, defendants' motion for summary judgment will be granted.

BACKGROUND

BSM is a Delaware corporation which does business in New Jersey. The Antares is a ship owned by the United States of America. BSM operates sea vessels, including the Antares, on behalf of the United States for the Department of Navy's Military Sealift Command. (Complaint P 8) The Antares was based in Baltimore, Maryland. (Complaint P 15)

On May 27, 1997, the plaintiff was employed by BSM in the capacity of Chief Steward on the Antares. Plaintiff and his department were responsible for cleaning the ship and operating the laundry services. As Chief Steward, plaintiff reported to the Master of the ship. Wattam was hired as Master of the Antares in mid-January, 1999. The plaintiff alleges that Wattam did not act in a professional or harmonious manner towards the plaintiff based on plaintiff's skin color. Plaintiff alleges that Wattam only engaged in "the barest minimum amount [of conversation] necessary [**3] to communicate his orders." (Complaint P 27) According to plaintiff, this lead to "an un-natural, counter-productive, and hostile work environment." (Complaint P 27)

On September 13, 1999, Wattam terminated plaintiff's employment because, according to the defendants, the plaintiff did not carry out the duties that Wattam had ordered the previous weekend. (Complaint P 31) Plaintiff claims that he was wrongfully discharged by Wattam due to racial discrimination. (Complaint P 52)

The record indicates that on September 13, 1999, the plaintiff filed a grievance report which is formally labeled the "Beef Report." In the Beef Report, plaintiff wrote that his "Beef Question" was: "being discharged under racial conditions, being discharged by unfair practice." (Defendant's Motion for Summary Judgment, Exhibit A) Dennis Metz was the official port agent who received the report. He made the following notes: "member filed beef 'report' on the above date, but had no statement or rebute [sic] to refute the discharge. Could, at this time

give me nothing to work with. Member will prepare a statement so that I may properly handle this grievance." (Defendant's Motion for Summary Judgment, Exhibit [**4] A) On September 14, 1999, the plaintiff made a subsequent statement in which he discussed the abusive attitude of Wattam and explained that "my department always seems to get jumped on about overtime and job performance. Maybe this is the time to mention that my department is all black (African Americans)." (Mosley Affidavit, Exhibit B, p. 4) Plaintiff supplemented this statement on September 17, 1999. (Mosley Affidavit, Exhibit C). In his third statement, plaintiff states: "I feel like Capt. Wattam should be trained in how to deal with Blacks. If his problem with blacks is more deeply rooted than that which can be corrected, then he should not be in the position as Captain of a vessel. Also in this particular day and age to have such prejudice openly displayed is beyond belief." (Mosley Affidavit, Exhibit C, p. 2)

A Port Committee hearing was conducted on November 30, 1999. At the hearing, two representatives of the Seafarers International Union ("SIU") Steve Ruiz and Dennis Metz, were present. (Mosley Affidavit [**195] P 23) Plaintiff was not represented by counsel. Plaintiff prepared and signed a hand-written agreement on November 30, 1999 which states: "I Christopher Mosley 467–06–0598 have [**5] agree [sic] to drop my beef against Bayship Management—that they drop the charges and agree to have quit on mutual consent." (Mosley Affidavit, Exhibit E) Following the hearing, Mr. Mosley received a copy of Dennis Metz's letter to BSM explaining the November 30, 1999 proceedings: "The Co. agreed to at the time of this meeting, to consider Mr. Mosley's mutual consent with regaurd [sic] to his discharge for cause. As a result Bay Ship Mgt. will drop any MIB and/or pending SAB charges. This agreement should conclude the incident/issue. Mr. Mosley as a result, is dropping any and all grievances relative to this matter." (Mosley Affidavit, Exhibit F)

Plaintiff then filed a complaint with the EEOC alleging racial discrimination claims against Wattam. BSM was not specifically named in the complaint to the EEOC. The plaintiff's exact words were: "I was employed as a Merchant Seaman on May 28, 1997, as the Chief Steward on board the USNS Antares. I was discharged from employment on September 13, 1999. I believe I have been discharged because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended." (Mosley Affidavit, Exhibit I) The EEOC sent plaintiff [**6] a right to sue letter dated January 27, 2000

On May 12, 2000, plaintiff filed a complaint in this Court claiming that defendants' discriminatory practices violated Title VII, 42 U.S.C. § 1981, the New Jersey Law Against Discrimination ("NJLAD") and the Maryland Commission of Human Rights Law. Specifically, the plaintiff's complaint makes the following claims:

1. Plaintiff was wrongfully discriminated against as an African American in violation of Title VII, the New Jersey Law Against Discrimination ("NJLAD") and the Maryland Commission of Human Rights Law. (Complaint P 51–66)

2. Defendants violated 42 U.S.C. § 1981 by creating and maintaining a hostile work environment. (Complaint P 67–77)

3. Plaintiff was wrongfully discharged in violation of Title VII. (Complaint P 78–84)

4. Defendants violated Title VII by creating and maintaining a hostile work environment. (Complaint P 85–89)

5. Defendants violated NJLAD by wrongfully discharging the plaintiff. (Complaint P 90–97)

6. Defendants violated NJLAD by creating and maintaining a hostile work environment. (Complaint P 98–103)

7. Defendants violated Article 49B by creating and maintaining [**7] a hostile work environment. (Complaint P 104–109)

8. Defendants interfered with the contract between the United States and BSM to which plaintiff is a third-party beneficiary. (Complaint P 110–114)

9. United States negligently delegated and entrusted the operation of the Antares by BSM. (Complaint P 115–117)

**STANDARD OF REVIEW**

A. Summary Judgment

Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material [*196] fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. See Celotex, 477 U.S. at 323. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." Id. at 325. [**8] In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The substantive law determines which facts are material Id. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" Id No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. See id. at 249.

B. Motion to Dismiss under Rule 12(b)(6)

A motion to [**9]  dismiss for failure to state a claim serves to test the sufficiency of the complaint. See Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In considering such a motion, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975); Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1988); Robb v. Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984). A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief See Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); Zynn v. O'Donnell, 688 F.2d 940, 941 (3d Cir. 1982). While a court must assume the alleged facts are true, it is not proper to assume that a plaintiff can prove facts not alleged. See Bishop v. Okidata, Inc., 864 F. Supp. 416, 420 (D.N.J. 1994). [**10]  A court may, however, consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. See Pension Ben. Guar. Corp. v. White Consol. Ind., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042, 126 L. Ed. 2d 655, 114 S. Ct. 687 (1994).

# DISCUSSION

A. Summary Judgment on Claims Subject to Release

The defendants argue that plaintiff's claims of wrongful discharge in violation of Title VII, 42 U.S.C. § 1981, and NJLAD should be dismissed because plaintiff signed a waiver of his right to bring all wrongful discharge claims by preparing and signing the release at the Port Committee Hearing on November 30, 1999

The standard for determining the validity of a release is the "totality of circumstances," but the Court of Appeals [*197] for the Third Circuit has established the factors which a court may consider:

> relevant factors in reviewing the totality of circumstances include, but are not limited to, the following considerations: (1) the clarity and specificity of the release language; [**11]  (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release: (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel: (6) whether there was an opportunity for negotiation of the terms of the Agreement: and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law

Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988), superseded by statute as stated in Long v. Sears Roebuck & Co., 105 F.3d 1529, 1539 (3d Cir. 1997) (holding that the factors established in Cirillo were no longer applicable to alleged waiver of ADEA rights because new legislation (the Older Workers Benefit Protection Act (OWBPA)) requires specific formalities when executing a release of liability under the ADEA).

A recent decision from the United States District Court for the District of New Jersey applied the Cirillo factors to a situation similar to [**12]  this case. See Riddell v. Medical Inter–Ins. Exch., 18 F. Supp. 2d 468 (D.N.J. 1998). The plaintiff in Riddle was charging her former employer with violations of the NJLAD The Court held that "the agreement itself could have made a finding of a valid waiver more likely if the Release language: (1) was more prominent: (2) identified the rights being waived; and (3) informed Riddell that she had time to deliberate and a right to consult with an attorney " Id. at 474.

In this case, an application of the Cirillo factors demonstrates that the release signed by Plaintiff does satisfy the "totality of circumstances" standard. Plaintiff signed a handwritten statement that he would drop his "beef" against BSM Although the word "beef" is not legalistic, it is clear The Court of Appeals for the Third Circuit has emphasized that clarity of the language is not as relevant as the comprehension of the terms by the person waiving their civil rights See Coventry v. United States Steel Corp., 856 F.2d 514, 522–24 (3d Cir. 1988) (acknowledging the importance of a contract law analysis regarding the ambiguity of terms but requiring a more [**13]  thorough analysis of the totality of circumstances involved in signing a waiver).

Page 20

Therefore, the main issue in this case is whether plaintiff knew that his "beef" against BSM included charges of discrimination. Plaintiff initiated the Port Committee Hearing by filing a grievance with the SIU (Mosley Affidavit Exhibits B and C) Plaintiff's initial statement in the formal Beef Report states that he was discharged due to racial discrimination and unfair practice. In his subsequent statements to the SIU, plaintiff mentions his suspicions that Wattam was treating him disparately due to plaintiff's African American heritage. Accordingly, plaintiff lodged a grievance regarding discriminatory conduct on the Antares. For plaintiff to claim he did not know that dropping his "beef" against BSM included dropping racial discrimination charges is disingenuous. Defendants point out that plaintiff understood the significance of a Beef Report because he filed a similar report in 1980 to lodge a grievance involving a passport. (Defendants' Memorandum of Law in Further Support of Motion for Summary Judgment, [*198] Exhibit B). Accordingly, when plaintiff agreed to drop his "beef" against the defendants, [**14] he knowingly and voluntarily waived his right to bring subsequent litigation.

The Appellate Division of the New Jersey Superior Court has adopted the totality of the circumstances test established by the Court of Appeals for the Third Circuit in Coventry and Cirillo. See <u>Swarts v. Sherwin-Williams Co., 244 N.J. Super. 170, 581 A.2d 1328 (App.Div.1990);</u> see also <u>Keelan v. Bell Communications Research, 289 N.J. Super. 531, 674 A.2d 603 (App.Div.1996)</u>. Consequently, the Court's analysis set forth above also shows that plaintiff executed a knowing and voluntary release of his claims under the NJLAD.

The plaintiff argues that he was not given the opportunity to consult with counsel. However, the record does not indicate that plaintiff was prohibited from seeking the aid of counsel. Dennis Metz and Steven Ruiz from the SIU were present to assist plaintiff. An examination of the official "Beef Report" reveals that the SIU representatives and plaintiff understood the association of the term "beef" with formal grievances against an employer.

Plaintiff next argues that he was unaware his Title VII claims were waived. However, plaintiff's subjective belief [**15] is insufficient to sustain his complaint. In Swarts, the court affirmed the trial court's grant of summary judgment for the defendant employer because the plaintiff was unable to establish a genuine issue of material fact. The plaintiff in Swarts had submitted a letter of grievance to his employer alleging forced retirement based on age discrimination. Subsequently, the plaintiff signed a release of any claims against his employer in consideration for payment of retirement benefits. In an affidavit filed later, the plaintiff claimed that he was unaware he was waiving his right to sue his employer for age discrimination. In affirming summary judgment, the court held that

> an opponent to a summary judgment motion cannot defeat the motion by raising a misguided subjective belief, without more, to create the existence of a genuine issue of material fact. In this instance, plaintiff seeks to establish a genuine issue of material fact by asserting in an "affidavit" he did not intend to waive his age discrimination rights when he signed the release. Yet, acceptance of that representation would allow defeat of the summary judgment motion based on a misguided subjective belief. [**16] At the time he signed the release, it is undisputed he had a full awareness of his age discrimination rights as evidenced by his prior assertion of his rights in his letter to the personnel department. What his unexpressed intention was is irrelevant. To draw any conclusion other than that he was fully aware of his age discrimination rights would belie logic and undermine the appropriateness of the summary judgment process as well as undermine the voluntary settlement process.

<u>Swarts, 244 N.J. Super. at 178</u> (citing <u>Cirillo, 862 F.2d at 452−53).</u> Under Swarts, the plaintiff in this case cannot defeat summary judgment based on his mistaken belief that the release did not include allegations of racial discrimination. The evidence of plaintiff's racial discrimination accusations against defendants in his initial "Beef Report" cannot be overcome by the plaintiff's alleged subjective belief that they were not what they clearly were.

The defendants next attack the plaintiff's argument that the release was signed under duress. Plaintiff contends that he was forced to execute the release [*199] because he would not be able to obtain employment if the circumstances [**17] of his termination were categorized as wrongful discharge. Both the Court of Appeals for the Third Circuit and the New Jersey Appellate Division have held that "economic pressure alone is not enough to constitute duress rendering an otherwise valid release void." <u>Keelan v. Bell Communications Research, 289 N.J. Super. 531, 548, 674 A.2d 603 (App. Div. 1996)</u> (citing <u>Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir.1975); The Adonis, 38 F.2d 743, 744 (3d Cir.1930); Killian v. McCulloch, 873 F. Supp. 938, 943 (E.D.Pa.1995); Reed v. SmithKline Beckman Corp., 569 F. Supp. 672, 674 (E.D.Pa.1983)).</u> In Keelan, the court rejected plaintiff's claim that he was under duress due to financial distress. See also <u>Swarts, 244 N.J. Super. at 179</u> (rejecting plaintiff's assertion that he had to sign the release under the duress of "sign or starve"). Accordingly, plaintiff's argument that he was forced to sign the release lacks merit. In fact, plaintiff received negotiated consideration for signing the release because BSM altered the reason for termination from "with cause" to "mutual [**18] consent," and BSM agreed to drop any charges against the plaintiff.

B. Dismissal of Claims based on Maryland Law

The plaintiff's opposition brief admits that the mention of Maryland law in the complaint was misplaced. Therefore, the plaintiff agrees to the dismissal of Claim 7 in its entirety, as well as dismissal of Paragraph 58 of Claim 1. (Plaintiff's Brief at p. 29, P 1)

C. Dismissal of Claims under the NJLAD

The defendants argue that the plaintiff is not entitled to protection under the NJLAD because the plaintiff has no connection to New Jersey. The plaintiff responds that New Jersey has a governmental interest in protecting non-inhabitants from discriminatory conduct violating the NJLAD by a corporation which does business in New Jersey. According to the record, plaintiff is a citizen of Pennsylvania and defendant BSM is a Delaware corporation. The alleged discriminatory conduct occurred in Maryland. Therefore, it seems that the facts of this case suggest little reason to apply the NJLAD. However, the Court need not address defendants' argument regarding the applicability of the NJLAD because this Court has already decided to grant defendants' motion for [**19] summary judgment.

D. Dismissal of Title VII Claims against Wattam

Defendants next argue that plaintiff's Title VII claim should be dismissed with respect to defendant Wattam because Title VII does not contemplate liability of individual employees. Defendants properly note that the Court of Appeals for the Third Circuit, like the majority of Circuits, has held that individual employees may not be held liable under Title VII. See Sheridan v. E.I. DuPont Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996), cert. denied, 521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997) ("Congress did not intend to hold individual employees liable under Title VII "); Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996) (holding that individual employees cannot be held liable under Title VII). Plaintiff's argument that individuals may be held liable under Title VII when they act as "agents" of the employer is without merit. In Kohn v. AT&T Corp., 58 F. Supp. 2d 393 (D.N.J. 1999), this Court vigorously rejected that very argument, and instead, citing the holdings of Sheridan and Dici, noted that the [**20] law in the [*200] Third Circuit is "settled" and "dispositive" in foreclosing any possibility of individual liability under Title VII. Kohn at 421; see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997). Thus, plaintiff's Title VII claims against individual defendant Wattam must be dismissed.

E. Plaintiff's Failure to Exhaust Administrative Remedies

The defendants argue that the plaintiff did not exhaust all the administrative remedies available because the plaintiff omitted information when he filed his complaint with the EEOC. First, the defendants claim that the plaintiff failed to mention BSM in the EEOC complaint so the EEOC has only investigated Wattam's role in the case. Second, the defendants claim that the plaintiff's hostile work environment claim is barred because plaintiff did not mention the charge of hostile work environment in his filings with the EEOC.

In Gooding v. Warner-Lambert, 744 F.2d 354 (3d Cir. 1984), the Court of Appeals for the Third Circuit noted that the issuance of an EEOC right-to-sue letter is not a jurisdictional prerequisite to a Title VII claim. Gooding, 744 F.2d at 358. [**21] Indeed, the Court of Appeals for the Third Circuit has held that "the failure to obtain a right-to-sue letter . . . is curable at any point during the pendency of the action" because the court will not "penalize the appellants" for the EEOC's failure to follow up on discharge charges or an attorney's failure to obtain right-to-sue letters. Anjelino v. New York Times Co., 200 F.3d 73, 96 (3d Cir. 1999); see also Gooding, 744 F.2d at 357-59 (eschewing "highly technical pleading rules, which only serve to trap the unwary practitioner " in favor of notice pleading, and reversing dismissal of Title VII action where an EEOC right-to-sue letter issued after complaint was filed); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976) (holding that "the parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charges of discrimination").

Accordingly, the holding in Anjelino runs contrary to the defendants' argument because the plaintiff could amend his EEOC complaint and cure the alleged failure to exhaust administrative remedies. [**22] However, the Court need not resolve this issue because it has dismissed plaintiff's claims of wrongful discharge and hostile work environment based on the plaintiff's release.

F. Dismissal of Contract Claims

Defendants move to dismiss the Eighth Count of plaintiff's complaint on the grounds that the common law causes of action for breach of contract and tortious interference are "subsumed" by the LAD. Defendants contend that these claims, which stem from the alleged racial discrimination, are duplicative of the LAD and should be dismissed. Upon careful consideration of the statutory language and case law, the Court disagrees.

The New Jersey state courts and this Court have frequently held that the LAD bars common law discrimination claims that are duplicative of the LAD. See, e.g., Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 492, 638 A.2d 1341 (App. Div. 1994) (holding that supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists); DeCapua v. Bell Atlantic – New Jersey, Inc., 313 N.J. Super. 110, 128, 712 A.2d 725 (Law Div. 1998) ("Because plaintiff's common-law breach of [**23] contract claim duplicates his statutory claim under New Jersey's LAD, it is barred "); Mardini v. Viking Freight, Inc., 92 F. Supp. 2d 378, 382-385 (D.N.J. [*201] 1999) (dismissing a wrongful termination claim which involved the same elements of discrimination as the LAD claim); DeJov v. Comcast Communications, Inc., 941 F. Supp. 468, 476 (D.N.J. 1996) (finding plaintiff's common law claim preempted by the LAD where plaintiff provided no information showing his common law claim was "different or broader" than his LAD claim).

However, it is clear from the case law and a review of the LAD itself that the LAD does not necessarily bar all common law causes of action that might be implicated in an LAD action. In Shaner v. Horizon Bancorp, 116 N.J. 433, 454, 561 A.2d 1130 (1989), the New Jersey Supreme Court noted that "a plaintiff in appropriate circumstances could pursue an independent action  to vindicate particular interests in addition to or aside from those sought to be protected by a LAD action." Shaner, 116 N.J. at 454; see also Dale v. Boy Scouts of America, 308 N.J. Super. 516, 543, 706 A.2d 270 (App. Div. 1998) [**24]  (internal citations omitted) aff'd 160 N.J. 562, 734 A.2d 1196 (1999), rev'd on

other grounds, 530 U.S. 640, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000). In the policy declaration accompanying the act the New Jersey Legislature made clear that it did not intend that the LAD would preempt other causes of action: [The LAD] shall be liberally construed in combination with other protections available under the laws of this State." N.J. STAT. ANN. § 10:5-3: see also, N.J. STAT. ANN. § 10:5-13 ("All remedies available in common law tort actions shall be available to prevailing plaintiffs.") Furthermore, § 10:5-27 of the LAD states:

> Nothing herein contained shall bar, exclude, or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination.

N.J. STAT. ANN. § 10:5-27. Given the statutory language, this Court finds that the legislature intended that the LAD would supplement, rather than preempt, other causes of action. Therefore, plaintiff's common law claims may not be dismissed.

1. Breach of Contract

Because plaintiff's common law claims [**25] are not preempted, the Court next considers defendants' argument that the Eighth Count of plaintiff's complaint should be dismissed because plaintiff has failed to allege the existence of any third party protections under a valid contract. The complaint alleges that defendant BSM breached its contract with the United States by failing to adhere to its requirement that BSM observe the civil rights laws of the United States, New Jersey and Maryland and that plaintiff was a third-party beneficiary of that contract. Since it is well-known that parties contracting with the United States and its agencies are required to observe civil rights laws applicable to performance of the contract, defendants' motion to dismiss the Eighth Count will be denied. n1

– – – – – – – – – – – – Footnotes – – – – – – – – – – – – –

n1 It does not appear that defendants seek summary judgment on the Eighth Count based on the release.

– – – – – – – – – – End Footnotes– – – – – – – – – – – –

2. Tortious Interference

The defendants also move to dismiss the Eighth Count of plaintiff's complaint for tortious interference with the contract between defendants [**26] and the United States Naval Forces. Defendants argue that plaintiff cannot sustain a tortious interference with contract claim because plaintiff has failed to identify any of the [*202] defendants as third parties to the contract. Consequently, defendants contend that plaintiff has failed to state a claim for relief for the Eighth Count in plaintiff's complaint.

New Jersey courts have held that it is "'fundamental' to a cause of action for tortious interference . . . that the claim be directed against defendants who are not parties to the relationship." Printing Mart–Morristown v. Sharp Electronics Corp., 116 N.J. 739, 752, 563 A.2d 31 (1989). Here, defendant BSM, as plaintiff's employer, was clearly a party to the alleged employment contract with the United States. As a result BSM cannot be held liable for tortious interference with its own contract. Custom Communications Eng'g v. E.F. Johnson Co., 269 N.J. Super. 531, 543, 636 A.2d 80 (App. Div. 1993) (stating that a tortious interference claim must be directed against persons who were not parties to a contract); Kopp v. United Technologies, Inc., 223 N.J. Super. 548, 539 A.2d 309 (App. Div. 1988) [**27] ("A party cannot be guilty of inducing the breach of its own contract").

Claims for tortious interference with a contract brought by an employee against a supervisor (such as Wattam) acting in the course of his employment must be dismissed. Horvath v. Rimtec Corporation, 2000 U.S. Dist. LEXIS 10128, 2000 WL 1030357, *9 (D.N.J. July 19, 2000). "Only when an employee asserts that an officer or agent of corporation (sic) acted outside the scope of his employment and/or for his own personal gain may the employee go forward with his claim for tortious interference." Id. Under New Jersey common law, "to be within the scope of employment, the employee's behavior must be 'actuated, at least in part, by a purpose to serve the master.'" Di Cosala v. Kay, 91 N.J. 159, 169, 450 A.2d 508 (1982) (quoting Restatement (Second) of Agency § 228 (1957)). Accordingly, plaintiff's allegation that Wattam tortiously interfered with the contract between BSM and the United States must be dismissed. However, the Court has denied defendants' motion to dismiss the Eighth Count as to plaintiff's claim that BSM breached its contract with the United States of which he is a third-party beneficiary.

Accordingly, [**28] IT IS on this 27Th day of December, 2000 ORDERED that the defendants' motion for summary judgment against the plaintiff on Counts One through Six, which are subject to the plaintiff's release, is granted; and it is further

**ORDERED** that the defendants' motion to dismiss the Seventh Count of plaintiff's complaint, alleging violations of Maryland law is granted; and it is further

**ORDERED** that defendants' motion to dismiss the Eighth Count of plaintiff's complaint, alleging breach of contract of which he is a third-party beneficiary, is denied

John C Lifland

United States District Judge

NORTHEAST JET CENTER, LTD, Plaintiff v. LEHIGH-NORTHAMPTON AIRPORT AUTHORITY; JACK YOHE; and STANFORD WARTELL, Defendants.

Civil Action No. 90-CV-1262

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1997 U.S. Dist. LEXIS 6493

May 5, 1997, Decided

May 5, 1997, FILED, ENTERED

**[*1]** Defendants' Motion to Amend Answer GRANTED; Defendants' Motion for Partial Summary Judgment on Count One GRANTED; case DISMISSED without prejudice. **COUNSEL:** For NORTHEAST JET CENTER, LTD, PLAINTIFF: JOEL E. LAIKS, GALLAND, KHARASCH, MORSE & GARFINKLE, P.C., WASHINGTON, DC USA. DAVID K. MONROE, GALLAND, KHARASCH, & GARFINKLE, P.C., WASHINGTON, DC USA.

For LEHIGH-NORTHAMPTON AIRPORT AUTHORITY, DEFENDANT: STEVEN M. JANOVE, TERESA N. CAVENAGH, WENDY R. HUGHES, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. J. BRUCE MC KISSOCK, MC KISSOCK & HOFFMAN, P.C., PHILA., PA USA. RICHARD FEDER, FINE, KAPLAN & BLACK, PHILA, PA USA. JODY A.G. WERNER, DUANE, MORRIS & HECKSCHER, PHILA, PA USA. INGRID B. HOPKINSON, MC KISSOCK AND HOFFMAN, P.C., PHILA., PA USA. For JACK YOHE, Airport Director, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above). RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above). For SANFORD WARTELL, Chairman of the Board of Directors, DEFENDANT: STEVEN M. JANOVE, (See above), TERESA N. CAVENAGH, (See above), WENDY R. HUGHES, (See above). J. BRUCE MC KISSOCK, (See above). **[*2]** RICHARD FEDER, (See above). JODY A.G. WERNER, (See above). INGRID B. HOPKINSON, (See above).

**JUDGES:** Franklin S. Van Antwerpen, United States District Court

**OPINIONBY:** Franklin S. Van Antwerpen

**OPINION: MEMORANDUM AND ORDER**

Van Antwerpen, J.

May 5, 1997

I. INTRODUCTION

Plaintiff brought this action in its Second Amended Complaint under 42 U.S.C. §§ 1983, 1985; 15 U.S.C. §§ 1, 2; 15 U.S.C. § 15; the Fourteenth Amendment to the United States Constitution; 53 Pa. C.S.A. § 306; Article I, Section 1, 9, and 26 of the Pennsylvania Constitution; 42 Pa. C.S.A. § 8343 and the common law of the Commonwealth of Pennsylvania. However, pursuant to our order of August 1, 1996 granting partial summary judgment the only remaining claims are those contained in Count I, and two state claims: intentional interference with a prospective contractual relationship and defamation. We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367. Venue for this action lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c).

II. PROCEDURAL HISTORY

This is not a case which is new to this court. Plaintiff **[*3]** filed a complaint on February 22, 1990. On May 31, 1991 we granted Defendants' Motion to Dismiss in part and denied it in part. 767 F. Supp. 672 (E.D. Pa. 1991). Plaintiff then filed its Second Amended Complaint on June 21, 1991. Subsequently, this case was delayed pending the criminal trials and subsequent conviction of Plaintiff's President, Mr. Earl M. Holtz for conspiracy to defraud the United States through improper filings with Federal Aviation Administration. See United States v. Holtz, 1993 U.S. Dist. LEXIS 16705, 1993 WL 482953 (E.D. Pa. Nov. 15, 1993), aff'd 31 F.3d 1174 (3d Cir. 1994); United States v. Holtz, 1994 WL 750674 (E.D. Pa. Feb. 6, 1994); United States v. Holtz, 1995 WL 106895 (E.D. Pa. March 13, 1995); United States v Holtz, 1995 WL 312537 (E.D. Pa. May 19, 1995). Thereafter, Defendants filed for summary judgment through two motions on January 22, 1996 and February 8, 1996. We granted those motions in part, but denied them as to the constitutional violations alleged in Count One, and the state claims alleged in count three (intentional interference with a prospective contractual relationship) and count six (defamation). We noted in our opinion of August 1, 1996 that neither **[*4]** party had sufficiently discussed the charges alleged in Count One, and we denied summary judgment pending further

briefing on the issues. Northeast Jet Center v. Lehigh—Northampton Airport Authority, 1996 U.S. Dist. LEXIS 11177, 1996 WL 442784 (E.D. Pa. Aug 1, 1996). In a letter dated September 3, 1996 to Defendants' counsel, Plaintiff's counsel outlined its Constitutional claims to ease discussion of this issue; he specified that Plaintiff's claims in Count One are brought under 42 U.S.C. § 1983, and are based upon a violation of equal protection and substantive due process. Consequently, on February 19, 1997, Defendants filed a Motion for Partial Summary Judgment on Count One, and Plaintiffs responded thereto on March 21, 1997. We therefore focus our discussion on Count One, and on whether Defendants' actions rise to the level of a violation of Section 1983. Due to the large quantity this court has previously written on this matter, we will not repeat the detailed facts we set out in our May 31, 1991 and August 1, 196 opinions; rather we will simply make reference to them as the need arises.

## III. GENERAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment [*5] shall be granted where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that
> there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Rule 56(e) further provides that, when a properly supported motion for summary judgment is made, the adverse party then "must set forth specific facts showing that there is a genuine issue for trial."

Of course, we must view all inferences in a light most favorable to the non—moving party and facts asserted by the non—moving party, if supported by sufficient affidavits and other evidentiary matter, must be regarded as true. United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993, (1962); Aman v. Cort Furniture Rental, 85 F.3d 1074, 1080 (3d Cir. 1996). However, the nonmoving party's burden is more than insignificant; "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also J.F. Feeser Inc. v. Serv—A—Portion, [*6]  Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991) (stating that, "the nonmovant must establish the existence of each element on which it bears the burden of proof") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; Matsushita Electrical Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). See also Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir ), cert. denied, 510 U.S. 994, 126 L. Ed. 2d 455, 114 S. Ct. 554 (1993)(nonmovant cannot rest on pleadings and must do more than create some metaphysical doubt).

Therefore, summary judgment must be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient [*7] to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. More generally, a genuine issue of fact is only present, precluding summary judgment, "when a reasonable trier of fact, viewing all the evidence, could rationally find in favor of the nonmoving party in light of the burden of proof placed on the nonmover" U.S. v. Premises Known as RR No.1 Box 224, Dalton Tp. and North Abington Tp., Lackawanna County, Pa., 14 F.3d 864, 870 (3d Cir. 1994)[citations omitted]. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. See also Kowalski v. L&F Products, 82 F.3d 1283, 1288 (3d Cir. 1996).

While the nature of its remedy is indeed powerful, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, [*8] but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action '" Celotex, 477 U.S. at 327 [citations omitted]. As the Third Circuit noted, "we are, after all, attempting to balance the defendants' need for protection from unfounded claims and vexatious litigation, with the plaintiff's rights to vindicate his or her constitutional guaranteed rights." Grant v. City of Pittsburgh, 98 F.3d 116, 126 (3d Cir. 1996).

## IV DISCUSSION

### A. 42 U.S.C. § 1983 Standard

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C.A. § 1983 (1996). The statute is not a source of substantive rights, but merely provides "'a method for vindicating federal rights elsewhere conferred '" Graham v. Connor, 490 U.S. 386, 393—94, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)).

In conjunction with the Due Process Clause of the Fourteenth [*9] Amendment, Section 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause that bar certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them; and (3) claims under the procedural component of the Due Process Clause relating to the deprivations of

life, liberty, or property without due process of law. Zinermon v. Burch, 494 U.S. 113, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).

To state a claim under Section 1983, a plaintiff must show both that (1) the offending conduct deprived the plaintiffs of rights secured by the Constitution of the United States, and (2) that such conduct was committed by a person acting under color of state law. Parratt v. Taylor, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986). The first issue we address is whether the plaintiff has presented evidence of a deprivation of a right [*10] secured by the Constitution. See Baker, 443 U.S. at 140; Collins v. City of Harker Heights, Texas, 503 U.S. 115, 121, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992) ("when a § 1983 claim is asserted against a municipality, [look at] : (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation") In the instant case, Plaintiff alleges that the Defendants acted to deprive it of equal protection and to deprive it of substantive due process. We will address each of these in turn.

**B. Deprivation of Right**

1. Res Judicata

Before we can reach Plaintiff's equal protection claim, we must decide the extent to which Plaintiff's claim is precluded by *res judicata*. Defendants did not include *res judicata* as an affirmative defense in their answer as is required by Fed.R.Civ.P. 8(c). Affirmative defenses not raised at that time are usually deemed waived pursuant to Rule 8(C); however, Rule 15(a) permits a party to amend its answer at any time by leave of the court and states that "leave shall freely be given when justice so requires." In an on—the—record telephone conference with the parties on [*11] April 10, 1997, a stipulation was entered into whereby Defendants' Motion for Partial Summary Judgment on Count One was deemed to also being a Motion to Amend Defendants' Answer to Plaintiff's Second Amended Complaint. Both Plaintiff and Defendants were given leave to address themselves more fully to this issue.

The Third Circuit has recognized that "failure to raise an affirmative defense by responsive pleading or appropriate motion ... does not always result in waiver." Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir. 1991). Indeed, we should permit an amendment unless the opposing party will be prejudiced. Plaintiff contends prejudice because of the length of time since the answer, and the fact that discovery is closed. However, neither of these actually prejudice Plaintiff to the extent that Defendants should be precluded from amending their answer.

Certainly, the passage of time alone is insufficient to create prejudice. Adams v. Gould, Inc., 739 F.2d 858, 867 (3d Cir. 1984). In addition, due to the intense similarities between the prior suit and the instant one, Plaintiff cannot credibly claim that it is surprised by the affirmative defense, or that the defense is [*12] unexpected. Finally, the fact that discovery is closed does not greatly prejudice Plaintiff, because the amendment that Defendants seek to make presents only a legal question for which all of the relevant facts are already before the court. As such, the addition of *res judicata* as an affirmative defense does not require any further discovery. See Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1376 (3d Cir. 1993); Brathwaite v. St. John's Episcopal Hospital, 1987 WL 25911, *2 (E.D.N.Y. Nov. 18, 1987). Therefore, we will permit Defendants to amend their answer to assert the affirmative defense of *res judicata*, and for purposes of the present motion will deem it to be so amended.

We now turn to the merits of the affirmative defense. The doctrine of *res judicata* provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir. 1995), (citing Board of Trustees of Trucking Employees v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)). Of course, the party asserting [*13] the defense bears the burden of showing that it applies. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984). Defendants must show that "there has been (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action" has presently been filed. Arab African International Bank v. Epstein, 10 F.3d 168, 171 (3d Cir. 1993); see also A.C. Elfman & Sons, Inc. v. Clime, 355 Pa. Super. 394, 513 A.2d 488, 489 (Pa. Super. 1986).

Defendants here assert that Plaintiff's equal protection claim based on the denial of a "through—fence" agreement is precluded because it was the subject of a prior federal suit that was dismissed with prejudice. We agree. In 1986, the Northeast Jet Company filed a complaint in this court against the Lehigh—Northampton County Airport Authority alleging, inter alia, a cause of action under Section 1983 for violation of its equal protection rights because the Authority had not granted it a "through—fence" agreement and had granted one to another company, ITT. Northeast Jet Company v. Lehigh—Northampton County Airport Authority, [*14] No. 86—CV—0179 (E.D. Pa. 1986). This case was dismissed with prejudice upon settlement of the parties. "Dismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial." Gambocz v. Yelencsics, 468 F.2d 837, 840 (3d Cir. 1972). Therefore, the dismissal with prejudice of the earlier suit in this case fulfills the first requirement of *res judicata*.

The second requirement is also satisfied, as the parties in the first and present suits are either the same or their privies. A party is considered a privy to an action when it has a mutual interest in the same action by some relationship with a party to an action, or when its interests are represented by that party. See Lawlor v. National Screen Service Corporation, 349 U.S. 322, 329—30, 99 L. Ed. 1122, 75 S. Ct. 865 (1955). Certainly, given the closeness of the relationship between Northeast Jet Center and Northeast Jet Company, the fact that they are both controlled by the same man, and the fact that Jack Yohe and Sanford Wartell act at and for the direction of the Lehigh—Northampton Airport Authority, all of the parties involved in the instant suit can [*15] be considered either parties or privies of the first suit.

Finally, the third prong, a subsequent suit based on the same causes of action, is also satisfied. The instant suit alleges, *inter alia*, that Defendants violated Section 1983 by unconstitutionally discriminating against Plaintiff because Defendants refused to give Plaintiff a "through–the–fence" agreement subsequent to granting one to another company, ITT. This claim is virtually identical to the one in the original suit which was dismissed with prejudice. As such, to the extent that the instant claim of a violation of Section 1983 is based on the equal protection allegation concerning the desired 1985 "through–the–fence" agreement, that claim is barred from consideration by this court by *res judicata*.

2. Equal Protection Claim

To the extent that Plaintiff's equal protection claims are not barred by *res judicata*, we will discuss the merits of each. Plaintiff asserts that its equal protection rights were violated because the Defendants intentionally discriminated against it by enforcing fixed–base operator ("FBO") standards that were both (1) not in effect and (2) not enforced against other FBOs at the airport; [*16] and by (3) not granting Plaintiff a "through–the–fence" agreement although they had granted one to another company previously. However, Plaintiff has failed to present sufficient evidence of discrimination, intentional or otherwise.

The Supreme Court has repeatedly held that a law which is "fair on its face and impartial in its appearance may nonetheless constitute illegal discrimination between persons if it is applied and administered by public authority with an evil eye and an unequal hand." Holder v. Allentown, 987 F.2d 188, 197 (3d Cir. 1993), quoting Yick Wo v. Hopkins, 118 U.S. 356, 30 L. Ed. 220, 6 S. Ct. 1064 (1886). Even if the duty imposed by the applicable statute or standard is "mandatory," public officials engage in unconstitutional discrimination when they seek to enforce the statute in order "to prevent the exercise of a fundamental right." Holder 987 F.2d at 197, quoting United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.), cert. denied, 493 U.S. 995, 107 L. Ed. 2d 543, 110 S. Ct. 546 (1989). In an equal protection claim of this sort, though, the plaintiff must provide evidence of intentional, or purposeful, discrimination by the defendants. [*17] Snowden v. Hughes, 321 U.S. 1, 8, 88 L. Ed. 497, 64 S. Ct. 397 (1944). Mere unequal treatment via a standard fair on its face is insufficient; there must be a showing of "clear and intentional discrimination." Id., citing Gundling v. City of Chicago, 177 U.S. 183, 186, 44 L. Ed. 725, 20 S. Ct. 633 (1900). Moreover, "to establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must [provide evidence] that similarly situated persons have been treated differently." Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2nd Cir. 1994).

Plaintiff points out that issues of intent are generally unsuited for summary judgment because courts should not resolve any genuine issues of credibility. Coolspring Stone Supply, Inc. v. American States Life Insurance Company, 10 F.3d 144, 148 (3d Cir. 1993); Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981). Nevertheless, if the plaintiff is unable to make an initial evidentiary showing of intent, there is no genuine issue of credibility for the jury to sort out, and summary judgment is appropriate.

In the instant case, Plaintiff has not met even this light burden; it has instead made mere conclusory [*18] allegations without support in evidence. It alleges that Defendants enforced FBO standards against it and did not enforce them against other companies; however, there is no reference to the record or any evidence to support this argument. It alleges that Defendants gave another company, ITT, a "through–the–fence" agreement but intentionally did not give it one; again, there is no reference to any evidence to support this. Plaintiff cannot survive at this stage solely on the statement that "there is ample evidence of animus against Center and its owner Earl Holtz by Defendants," Plaintiff's Brief at 22, without providing us with at least one example of this evidence.

Defendants, to the contrary, point us to many places in the record where an absence of an intent to discriminate is clear. They note that the lease which Plaintiff held with Defendants specifically references the applicable FBO standards; that those standards required that tenants providing FBO services have an FAA license which permitted them to do so; and that when Plaintiff turned in that license to the FAA, Defendants properly considered Plaintiff to be in breach of its lease. Defendant's Brief at 21–25 and [*19] included cites to the record therein. These actions seem eminently reasonable to us in light of the evidence which has been presented to us. There has been no evidence of the requirements within the leases of the other companies involved, or of whether there are differences or similarities therein to Plaintiff's lease that would require certain action by Defendants.

Plaintiff places a great deal of reliance on our dicta in our August 1, 1996 opinion that there is no mention of a Part 145 certificate in the lease or the applicable standards; however, this reliance is misplaced. Upon further review of the lease and standards, we find that fourth requirement under "Aircraft Maintenance" on page 10 of the FBO minimum standards incorporated into the lease states that, "The Fixed Base Operator must be able to obtain from the F.A.A. a license to operate a Class One and Three repair station." This statement, as Defendants point out, is a direct reference to a Part 145 certificate, and was relied upon by them in finding the plaintiff to be in breach of its lease.

Defendants also provide evidence to contradict Plaintiff's bare allegations regarding the "through–the–fence" agreement. n1 They [*20] state that they had provided another company, ITT, with such an agreement in 1984; however, the FAA subsequently informed them that it did not approve of these agreements, it did not want Defendants to grant any more, and it then provided Defendants with a copy of its new policy "Minimum Compliance Standards for Through–the–Fence Operations" in July 1985. Therefore, Defendants declined to provide such an agreement with Plaintiff in 1985 not out of a desire to discriminate, but solely to acquiesce to a recent FAA mandate. Defendants Brief at 26–27 and included cites to the record therein. Plaintiff has provided us with absolutely no evidence to rebut this. As such, its claim cannot survive

n1 Although we have decided that this claim is barred by *res judicata*, above, we will discuss the issue for clarity.

– – – – – – – – – – – – End Footnotes– – – – – – – – – – – – – –

2. Substantive Due Process

Plaintiff also bases its Section 1983 claim on an allegation of a violation of substantive due process. Plaintiff argues that Defendants, under color of state law, intentionally **[*21]** acted to deprive it of property rights protected by the Constitution. Specifically, it claims that Defendants forced Plaintiff into financial despair, destroyed Plaintiff's FBO business, and forced Plaintiff to leave the Lehigh Valley International Airport through defamation and intentional interference with potential business relations. Defendants' Brief, Exhibit A at 1. Regardless of the extent to which Plaintiff makes a state cause of action, it has not provided us with any evidence of a constitutional violation.

The Due Process Clause of the Fourteenth Amendment declares that no state shall deprive any person of life, liberty, or property, without due process of law. The clause has a substantive component that bars "certain government actions regardless of the fairness of the procedures used to implement them." Planned Parenthood v. Casey, 505 U.S. 833, 846, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)). Thus, where public officials "invoke administrative processes with an illicit purpose, they are violating substantive due process." Grant v. City of Pittsburgh, 98 F.3d 116, 125 [*22]    (3d Cir. 1996). In order to succeed on a substantive due process claim, Plaintiff "must prove that the governmental authority acted to infringe a property interest encompassed by the Fourteenth Amendment." DeBlasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592, 600 (3d Cir.) [citations omitted], cert. denied, 133 L. Ed. 2d 247,    U.S.    , 116 S. Ct. 352 (1995).

The first question, whether a basic property interest has been alleged and supported with evidence, is a question of state law. Acierno v. Cloutier, 40 F.3d 597, 616 (3d Cir. 1994). However, "under the law of this circuit, 'not all property interests worthy of procedural due process protections are protected by the concept of substantive due process'" Homar v. Gilbert, 89 F.3d 1009, 1021 (3d Cir. 1996) (quoting Reich v. Beharry, 883 F.2d 239, 244 (3d Cir. 1989)), cert. granted,    U.S.    , 117 S. Ct. 678 (U.S. Jan. 3, 1997) (No. 96−651). Therefore, plaintiff must instead have been deprived of "'a certain quality of property interest'" Homar, 89 F.3d at 1021 (quoting DeBlasio, 53 F.3d at 600). This is because, "substantive due process protects **[*23]**   fundamental interests, not state−created contract rights." Charles v. Baesler, 910 F.2d 1349, 1353 (6th Cir. 1990). Indeed, what constitutes a property interest for the purposes of procedural due process might not so constitute for the purposes of substantive due process, because "property rights for procedural due process purposes are created by state law, [and] substantive due process rights are created by the Constitution." DeBlasio, 53 F.3d at 599. The Supreme court has held that where claims are more analogous to state−law tort claims, substantive due process is usually not implicated. Collins v. City of Harker Heights, Texas, 503 U.S. 115, 128, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992).

The second question to be considered is whether, in the context of a governmental deprivation, the government authority "deliberately and arbitrarily abused its power." Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1179 (3d Cir. 1997) (citing Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir. 1991), cert denied, 503 U.S. 984, 118 L. Ed. 2d 389, 112 S. Ct. 1668 (1992)); see also Rogers v. Bucks County Domestic **[*24]**   Relations Section, 959 F.2d 1268, 1277 (3d Cir. 1992) ("the fundamental question underlying a substantive due process claim is whether a statute or regulation irrationally or arbitrarily deprives an individual of an established right") n2 This abuse occurs where actions are taken that are intentional or "motivated by bias, bad faith, or partisan or personal motives unrelated to the merits of the matter before it." Id.

n2 While Defendants contend that the appropriate standard is that the government action "shocks the conscience" per Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994), this is incorrect. The Third Circuit has suggested, albeit not very clearly, that this standard is used only in police pursuit cases, or where there is a state created danger. See, Evans v. Avery, 100 F.3d 1033, 1037 (3d Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3611 (U.S. Feb. 28, 1997) (No. 96−1390); Kneipp v. Tedder, 95 F.3d 1199, 1207 (3d Cir. 1996); Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995), cert. denied,    U.S.    , 116 S. Ct. 165, 133 L. Ed. 2d 107 (1995). We note, though, that Defendants' actions are not only not arbitrary, they do not "shock the conscience."

– – – – – – – – – – End Footnotes– – – – – – – – – – – –

**[\*25]**

Plaintiff frames its claim by saying that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business, undermine the value of plaintiff's assets, force plaintiff off of the ABE Airport, and acquire plaintiff's hangar and business for less than it was worth " Defendants' Brief, Exhibit A at 1  Certainly, "ownership is a property interest worthy of substantive due process protection " DeBlasio, 53 F.3d at 600. However, a closer examination of Plaintiff's claim demonstrates that it boils down to a claim of defamation (lost reputation), loss of the backing of a bank, and loss of a potential contract with another company, Union Pacific. Therefore, despite the ultimate result, Plaintiff has demonstrated no evidence that supports a tangible property interest protected by the Fourteenth Amendment

In Paul v. Davis, 424 U.S. 693, 701, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976), the Supreme Court held that injury to reputation is not a liberty or property interest protected by the due process clause of the Fourteenth Amendment. To state a claim for defamation under Section 1983, "a plaintiff must allege loss of a recognizable property or liberty **[\*26]** interest in conjunction with the allegation of injury to reputation " Cooper v. Dupnik, 924 F.2d 1520, 1532 (9th Cir. 1991). This has been called the "stigma–plus" or "defamation–plus" test. To meet the "plus", the plaintiff must demonstrate that the defamation caused the denial of a federally protected right, or that the defamation occurred in connection with a federally protected right. Business losses and public scorn have been held to not meet the "plus" requirements, because such consequences would not usually be the direct result of any affirmative conduct by the parties making the defamation. Id ; Buckey v. County of Los Angeles, 957 F.2d 652, 655 (9th Cir. 1992); Green v. DeCamp, 612 F.2d 368, 371 (8th Cir. 1980).

In the instant case, Plaintiff has not brought forth any evidence which connects the alleged defamation with any specific property or liberty interest protected by the Fourteenth Amendment. Plaintiff appears to assert that merely because this court found that Plaintiff had sufficiently pled a Section 1983 action following Defendants' Motion to Dismiss, we should consequently find, without more, that the claim withstands summary judgment. This is a gross **[\*27]** misstatement of summary judgment law, as discussed above; Plaintiff cannot avert summary judgment by simple denials, and must at the very least produce sufficient evidence to support each element of its claim. Our earlier memorandum on Defendants' First Motion for Summary Judgment also does not provide Plaintiff with the support it seeks; we ruled only that the issues of equal protection and substantive due process had not adequately been briefed and thus the motion would be denied pending further briefing. Northeast Jet Center, 1996 WL 442784 at *7.

Plaintiff also argues without evidentiary support that the "plus" part of their defamation can be found in the loss of prospective business relationships. Plaintiff's Brief at 29. However, we do not believe there is any support for the proposition that there is a constitutionally protected property interest in potential business. As the Ninth Circuit held in Cooper, business loss generally does not create the "plus" needed to turn defamation into a Section 1983 violation. Cooper, 924 F.2d at 1534. Plaintiff's reliance on DeBlasio, 53 F.3d 592 (3d Cir. 1995), is misplaced, as the statement regarding potential property **[\*28]** interests came in dicta in the context of a procedural due process claim, not substantive due process. Plaintiff's reference to Petrone v. City of Reading, 541 F. Supp. 735 (E.D.Pa. 1982), in a footnote is similarly unavailing. That case, which is not controlling to us, held that the plaintiff had satisfied the "plus" requirement by asserting a direct loss of his business and his employment, not a loss of potential business relationships. Despite the interest that tort and contract law has in preserving business relationships, this is not a property interest worthy of constitutional protection. See Charles v. Baesler, 910 F.2d 1349, 1354 (6th Cir. 1990) (citing Regents of the University of Michigan v. Ewing, 474 U.S. 214, 229–30, 88 L. Ed. 523, 106 S. Ct. 507 (1985)(Powell, J., concurring)); Reich v. Beharry, 883 F.2d 239, 243–44 (3d Cir. 1989). Simply, Plaintiff has not provided us with any evidence that would create a genuine issue as to the existence of a property or liberty interest protected by the Fourteenth Amendment. n3

– – – – – – – – – – – – Footnotes – – – – – – – – – – – – – –

n3 Nor does Plaintiff have the required level of property interest in the loss of potential business, relationships in and of themselves. Because actions which may state a claim in tort do not necessarily rise to the level of Constitutional protection, Plaintiff's must produce evidence of something more. Baker v. McCollan, 443 U.S. 137, 146, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). They have not done so, and thus have not met their very limited burden in this regard.

– – – – – – – – – – End Footnotes– – – – – – – – – – – –

**[\*29]**

Even assuming a property interest, Plaintiff has not offered any evidence that Defendants "deliberately and arbitrarily" abused their power. Plaintiff argues rather summarily, and without reference to the record, that because there is no reference to a Part 145 license in the lease or the FBO standards, Defendants acted arbitrarily by finding Plaintiff in breach of its lease in October 1988. Further, Plaintiff states that Defendants acted arbitrarily by refusing to release Plaintiff from its breach of lease following the reissuance of its Part 145 license from the FAA in

February of 1989 and instead waiting to do so until May, 1989. Finally Plaintiff states, without more, that "Defendants embarked upon a year-long campaign to undermine [Plaintiff's] business and drive it off the Airport." Plaintiff's Brief at 32.

None of these statements create a genuine issue of material fact in light of the evidence currently before the court. Rather, it is apparent that, as we noted above, the standards incorporated into the lease do require that Plaintiff, if acting as an FBO, to obtain the appropriate FAA license. When Plaintiff voluntarily forfeited its license to the FAA, it was in breach [*30] of that lease, and it was far from arbitrary for the Defendants to so inform Plaintiff. The "consultant's opinion" to which Plaintiff refers does state that Plaintiff was not in breach of its lease when its sister company lost its Part 135 operating license following a plane crash; however, the opinion does not discuss the issue of whether the loss of a Part 145 license would create a breach and is therefore irrelevant. The lease additionally required Defendants to inform those holding a first mortgage lien on Plaintiff's leasehold of any breach. Defendant's Motion for Summary Judgment, January 22, 1996, Exhibit C at III.D.1. Therefore, the notice provided to Plaintiff's bank was not done by arbitrary or bad faith decisions. As for the delay in the release of the breach, Plaintiff offers no evidence to contradict the testimony and evidence offered by Defendants that the sole reason Defendants did not declare Plaintiff to have repaired its breach as early as February, 1989 was that they were awaiting the final report from their consultants, Airport Corporation; when they received a report stating the conclusion that Plaintiff was in compliance with the lease on April 22, 1989, [*31] Defendants placed it on the agenda for the next board meeting in May. See Plaintiff's Brief, Exhibit 11 at 1740. Finally, despite the plethora of exhibits attached to Plaintiff's brief, Plaintiff makes no reference to any evidence therein which would create a genuine issue as to the arbitrariness or inappropriate nature of Defendants' actions regarding Union Pacific. It is clear to us that Defendants acted carefully and reasonably in the context of the situation, and in the absence of evidence to the contrary, summary judgment is appropriate.

## C. Under Color of State Law

To set forth a claim under Section 1983, the plaintiff must not only show that it has been intentionally and arbitrarily deprived of a constitutionally protected right, but must also demonstrate that the person who deprived him of this right did so under the color of state law. We have found that Plaintiff has not been so deprived of a right protected by the Constitution, above; however, we will discuss the matter further for clarity.

### 1. Official Custom or Policy

It is well established that respondeat superior is not a basis for municipal liability under § 1983; however, municipalities may be directly [*32] liable under § 1983 for acts implementing a policy, practice, or custom which deprive a person of constitutional rights. Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (3d Cir. 1991); Monell v. City of New York Dep't of Social Services, 436 U.S. 658, 691-95, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). There are two predicates to direct municipal liability under section 1983: (1) identification of the relevant policymakers and (2) evidence that the policymakers' decisions caused the deprivation of rights at issue by policies which affirmatively commanded that such deprivation occur or by acquiescence in a longstanding practice or custom which constituted the "'standard operating procedure'" of the local government entity. Simmons v. Philadelphia, 947 F.2d 1042, 1062 (3d Cir. 1991), cert. denied, 503 U.S. 985, 118 L. Ed. 2d 391, 112 S. Ct. 1671 (1992); Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Execution of the government's policy or custom must inflict the injury. Simmons, 947 F.2d at 1059 (citing Monell, 436 U.S. at 694).

To show the first prong, the plaintiff must show that an official who has the final power to make policy is responsible [*33] for the particular course of action which caused the deprivation at issue. Bielevicz, 915 F.2d at 850. That is, "scienter-type evidence must have been adduced with respect to a high-level official determined ... in accordance with local law, to have final policymaking authority in the areas in question." Simmons, 947 F.2d at 1063. The Supreme Court has held that to be an "authorized decision maker," that official must be vested with full policy making authority; it is not enough that the official have discretionary authority to make a decision if that decision can be overturned by another who has the final authority to make policy that binds the municipality. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986); Bielevicz, 915 F.2d at 850 (the official must have "final, unreviewable discretion to make a decision or take an action"). Indeed, municipal liability attaches "where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Pembaur, 475 U.S. at 483-84. [*34] Whether an individual or group is a policymaker for purposes of Section 1983 is a question of state law. Pembaur, 475 U.S. at 483.

In the case at bar, it is clear that the Board of Governors for the Airport Authority is the group responsible for establishing final airport policy. See Pa. Stat. Ann. tit. 53, § 309(A) (1996) ("Governing Body"). See also Jett v. Dallas Independent School District, 7 F.3d 1241, 1245-6 (5th Cir. 1994) (holding that pursuant to relevant municipal code, neither Superintendent nor Principal had final authority because the code vested such authority in the district's board of trustees). Neither Defendant Yohe nor Defendant Wartell have the final discretion required for their actions to bind the Authority, and Plaintiff has not demonstrated any evidence to the contrary.

The second prong can be satisfied in a variety of ways. Certainly, the existence of a policy or custom authorizing the conduct is sufficient. A "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Simmons, 947 F.2d at 1059 (quoting Monell, 436 U.S. at 690). It is also made when "a decisionmaker [*35] possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Bielevicz, 915 F.2d at 850. A "custom" lacks formal approval but is a given course of conduct that is so well settled and permanent that it has the force of law. Monell, 436 U.S. at 651. In addition, the Supreme Court has held that the second prong can be satisfied for "a single decision by municipal policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480.

Plaintiff points to the decision to find it in breach of its lease, the FBO standards, and the "through–the–fence" policy as policies approved and authorized by the Board of Governors. However, these examples disguise what appears to be Plaintiff's true argument: that Defendants "undertook an intentional course of conduct designed to destroy plaintiff's FBO business." Defendants Brief, Exhibit A at 1. Plaintiff is really contending that Defendants made specific decisions to destroy its business and force it off the Airport, but has produced no evidence to the effect that the Board of Governors either affirmatively approved such decisions or were deliberately indifferent [*36] to them. Moreover, even if Plaintiff could demonstrate that Defendants Yohe and Wartell had the requisite position of final authority, it has pointed us to no evidence that would support the conclusion that Defendants had made any decisions or actions to ruin Plaintiff's business or force it to leave the Airport.

2. Qualified Immunity

To the extent that it is necessary to discuss the qualified immunity of Defendants Yohe and Wartell, given the above, we find that they are so protected. The Supreme Court established the standard for a grant of qualified immunity in Harlow v. Fitzgerald, 457 U.S. 800, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982). The Court stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In order to apply this test, the Court concluded that on summary judgment, the trial judge must determine "whether the law was clearly established at the time the action occurred." Id.

The Third Circuit expanded on this, saying [*37] that, "the right an official is alleged to have violated must have been 'clearly established' in a 'particularized' sense. That is, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Abdul–Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993) (citing Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987) (holding that the question revolves around whether the official would know that his specific conduct was violate a clearly established right). Indeed, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). We note that the Third Circuit has also delineated the tension between the Supreme Court's instruction that qualified immunity be determined preferably at the summary judgment stage, and the need to carefully examine the specific conduct of the defendants. Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996).

In the instant case, we have reviewed the conduct of the Defendants in detail, and it is plain that Defendants Yohe [*38] and Wartell were neither incompetent nor knowingly violating the law. As we discussed more fully, above, express provisions in the lease warranted the notice of default, and FAA policy required the denial of the 'through–the–fence' agreement. Moreover, there has been no evidence that Defendants were acting to violate any law when they negotiated with Union Pacific, or issued a statement that the Airport did not have a satisfactory FBO operator. Rather, the evidence suggests legitimate reasons for Defendants actions such that qualified immunity for Mr. Yohe and Mr. Wartell is appropriate.

**D. Proximate Cause**

Finally, Plaintiff has also failed to produce evidence which demonstrates a genuine issue with regard to the final element of a Section 1983 claim, that the alleged unlawful policy or custom was the proximate cause of the injuries suffered. To do so, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Bielevicz, 915 F.2d at 850 (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)). The question of proximate [*39] cause is generally a question for the fact–finder; however, if the causal link is so tenuous or without evidence as to be implausible, it may be decided at summary judgment. Bielevicz, 915 F.2d at 851.

In the instant case, Plaintiff attempts to combat a very tenuous causal link with blanket, conclusory statements and no reference to the record. The evidence demonstrates that as a result of a 1988 plane crash and FAA investigation, Plaintiff's sister company was required to turn in its Part 135 (flying) certificate. The ensuing business loss greatly affected Plaintiff's ability to provide FBO services, and consequently it turned in its Part 145 (FBO) certificate to the FAA. This put Plaintiff in breach of its lease, and caused Union Pacific, a potential business partner, a great deal of concern about the viability of any co–projects. This court therefore sees little causal connection between any of Defendants' actions and Plaintiffs loss of business. As such, Plaintiff has failed to create any genuine issues of material fact relating to its Section 1983 claims, and summary judgment for the Defendants is appropriate at this time.

V. CONCLUSION

For the foregoing reasons, we will [*40] grant Defendants' Motion for Partial Summary Judgment on Count One.

The two remaining counts, defamation and interference with a prospective contractual relationship, are state counts. There is no diversity in this action, and we decline to retain supplemental jurisdiction now that all of the federal claims have been eliminated.

An appropriate order follows.

**ORDER**

AND NOW, this 5th day of May, 1997, upon consideration of Defendants' Motion for Partial Summary Judgment on Count One, filed February 19, 1997 and which we previously deemed to also be a Motion to Amend Answer, Plaintiff's Opposition to Defendants' Motion, filed March 21, 1997, Defendants' response thereto, filed April 16, 1997, Plaintiff's Opposition to Defendants' Motion to Amend Answer, filed April 17, 1997, and Defendants' response thereto, filed April 21, 1997, it is hereby ORDERED, consistent with the foregoing memorandum, that:

1. Defendants' Motion to Amend Answer is GRANTED;

2. Defendants' Motion for Partial Summary Judgment on Count One is GRANTED;

3. This court no longer has jurisdiction over the remaining two state claims, and therefore this case is DISMISSED without prejudice to Plaintiffs' ability [*41] to bring those claims in the appropriate state court. We express no opinion as to the merits of those claims; and

4. This case is CLOSED

BY THE COURT

Franklin S. Van Antwerpen

United States District Court